2010 Ark. 497

**Mike E. CARR, Michael L. Carr, C.L. Carr, C.L. Carr, Jr., and Tahoe Gaming, LLC, Appellants,**

v.

**Stewart NANCE and John Pruett Nance, Appellees.**

No. 10–562.

Supreme Court of Arkansas.

Dec. 16, 2010.

Rehearing Denied Jan. 20, 2011.

Kutak Rock LLP, by: Russell C. Atchley, Fayetteville, and Younes Law Firm, by: Van T. Younes, Harrison, for appellants.

Baber & Luppen, by: Brent Baber, Little Rock, and Brian G. Brooks, Attorney at Law, PLLC, by: Brian G. Brooks, Greenbrier, for appellees.

JIM GUNTER, Justice.

Appellants, Mike Carr, Michael Carr, C.L. Carr, Jr., C.L. Carr, and Tahoe Gaming, LLC, appeal a jury verdict in favor of appellees Stewart and Pruett Nance. Appellants argue that the circuit court erred in (1) denying their motion for judgment notwithstanding the verdict and (2) giving a jury instruction regarding punitive damages. Appellees cross-appeal the court's order of remittitur that reduced Stewart Nance's compensatory damages from $400,000 to $233,707.42. This case involves an issue of first impression, of public interest, and needing clarification and development of the law. Therefore, we have jurisdiction pursuant to Ark. Sup. Ct. R. 1–2(b)(1), (4), and (5). We affirm on direct appeal and reverse on cross-appeal.

In a complaint filed November 2, 2005, appellees filed suit against appellants, alleging that on September 9, 2005, appellees were riding all-terrain vehicles (ATVs) on property owned by Westek Corporation, Inc., in Newton County.[1] The property was the former site of the Dogpatch theme park. Mike Carr, believed to be an owner or agent of Westek, had spoken to the plaintiffs and was aware of their presence on the property. As Pruett was driving down a defined road, he drove into a steel cable that was strung between two trees. The cable struck Pruett in the throat, and he was jerked off the ATV. The complaint alleged that appellants had placed the cable, which was not marked by flags or any other markings, across the road and that the cable was placed in such a position and height that it could only be designed to injure a person driving on the road. Appellees contended that appellants had acted in willful and wanton disregard for Pruett's safety, that appellants had created a hazard on the property that was not open and obvious and that created an unreasonable risk of harm, and that appellants failed to warn Pruett of the danger. Because appellants knew or should have known that such conduct would cause injury, and the conduct proximately caused damages to appellees, appellees sought compensatory and punitive damages for the personal injuries suffered by Pruett, medical expenses, and lost wages. Appel-

---

1. The original plaintiffs in this case were Stewart Nance and Lynn Larson, individually and as parents of Jon Pruett Nance, and Pruett Nance. The original defendants were Westek Corporation, Inc., and Mike Carr. The plaintiffs amended their complaint on September 11, 2006, and added Michael Carr, son of Mike Carr; Tahoe Gaming, LLC; Leisuretek, Ltd.; C.L. Carr; C.L. Carr, Jr.; Ford Carr; Alberta Carr; and John Does 1–50 as defendants. Immediately prior to trial, the circuit court announced that certain changes in the parties to the litigation had been made; specifically, the circuit court stated that Lynn Larson was no longer a plaintiff and that the only remaining defendants were C.L. Carr, Jr., C.L. Carr, Mike Carr, Michael Carr, and Tahoe Gaming. However, no written order was entered dismissing Lynn Larson as a plaintiff or dismissing Westek Corporation, Leisuretek, Ltd., Ford Carr, and Alberta Carr as defendants, and on the first appeal of this case, the appeal was dismissed without prejudice by this court due to a lack of a final order. *Carr v. Nance,* 2010 Ark. 25, 2010 WL 199626. A final order dismissing the remaining parties has now been entered, and the appeal is properly before this court.

lants answered and alleged that appellees were trespassing on the property in Newton County after having been given notice not to do so. Appellants pled the affirmative defense of comparative negligence.

A trial was held in Newton County on September 16–17, 2008. The relevant testimony presented at trial included the following. Pruett Nance testified that on the day of the accident, he was with his dad, Stewart, and his girlfriend, Jessica Voros, and that they drove four-wheelers over to the Dogpatch property. Pruett testified that when they approached the property, he let his dad go ahead of him because his dad had to talk to the caretakers of the property and get permission from them to ride on the property. Stewart began talking to Mike Carr, and Pruett and Jessica drove around the gravel parking lot and waited. Pruett testified that a teenager on a moped was also in the parking lot. Pruett finally made eye contact with his dad, and his dad let him know that it was okay to ride around the property, specifically toward the train bridge, because that was the direction they usually went. Pruett testified that he and Jessica headed south and then stopped at a place called "kissing rocks." While stopped, he saw the boy on the moped turn and go up a hill and then come back down. After a few minutes, Pruett and Jessica headed up the same hill on an asphalt road toward the highway. Pruett testified that he was going up the hill through a grove of trees, looking toward the highway, when he saw a cable about two feet in front of him. The cable had no flags or markings on it. He said he had no time to react and that he drove right into it. Pruett testified that he was knocked out for a split second, and when he woke up, he was looking at the sky. He rolled over onto his hands and knees and could tell something was wrong because he could not breathe and could not move his head or neck without severe pain.

Pruett stated that he was bleeding a lot, coughing, and had a sensation like he was choking.

Pruett recalled a van ride into town, where an ambulance met him and his father, but did not remember a helicopter taking him to Springfield. He testified that he woke up in a hospital in Springfield and could not move. He was wearing a neck brace and had undergone surgery on the back of his neck. He could not speak for months but was finally able to whisper in the spring of 2006. He testified that his voice is getting better but that he runs out of breath quickly and cannot exert himself for very long. He also testified that he cannot move his head very much and that he has problems with gagging and coughing while eating.

On cross-examination, Pruett testified that he was wearing a helmet when they drove over to the Dogpatch property, but when he got there he took his helmet off. He also acknowledged that the manufacturer's recommendation was that there not be a passenger on the four-wheeler. He stated that he knew there were some clean-up and construction activities in progress on the property and that the owners or caretakers of the property were concerned with vandalism and some trespassing incidents that had occurred. On redirect, Pruett stated that he had previously overheard a conversation between his dad and Mike Carr, and Carr had told his father that it would be "fine" if they came on the property and asked that they check in with him so he would know they were there.

Jessica Voros testified that, on the day in question, she was riding on the back of Pruett's four-wheeler. She testified that she saw the boy on the moped a couple of times, but that she never saw him with a cable or wire rope in his hand. She testi-

fied that when the accident occurred, she first saw the cable strung between two trees when they were about a foot away from it. She testified that she woke up after hitting the cable and saw Pruett throwing up blood, so she ran to get his dad. She stated that she saw Mike Carr arrive at the scene along with the young man on the moped. She testified that she had bruises, a black eye, a busted lip, and scratches everywhere. She stated that when they hit the cable, Pruett's head hit her head, and she hit her head on the concrete.

Wes Cyrus, Pruett's cousin, testified that in May 2005, he was riding four-wheelers on the Dogpatch property with some other family members, including several younger children. He stated that as they were leaving the park, they were stopped by a man and a younger-looking kid who was pointing a shotgun at them. Cyrus stated that they were held there for two hours until the police showed up and that the men explained that they had problems with trespassers and vandals on the property.

Dean McKnight, a friend of the Nances, testified that Stewart called him the day after the accident and asked him to pick up his four-wheeler from the scene of the accident and to take some pictures of the area around where the accident occurred. He testified that some |6brush had been piled up recently and that dirt was being spread over the paved road where the accident occurred. He also testified that he had previously used cable to barricade roads, and on cross-examination, he testified that he believed it was an acceptable method for creating a barricade across a road. On redirect, he clarified that to be safe, some kind of reflecting metal or caution tape should be put on the cable to indicate its presence. He also testified that hanging a cable "neck high to a four wheeler" would be dangerous.

Stewart Nance testified that his nephew, Wes Cyrus, told him what happened in May 2005 and that some time after that he met Mike Carr, the person who had stopped Cyrus. Cyrus told Stewart that Mike had acknowledged that the Nances were not the vandals they were looking for and that they could come back under certain conditions, namely during the daytime with notice or permission. Stewart testified that in June, he introduced himself to Mike and asked if they could visit the property during the day with his permission. Stewart stated that Mike told him they could. Mike also told him a couple of times that he was having problems with trespassers and that he would police the property himself if necessary. Stewart testified that he returned to the property several times, and each time he spoke to Mike Carr and got permission to be on the property.

Stewart testified that on the day in question, he, Pruett, and Jessica had driven over to the property and parked in the parking area, where he spoke to Mike Carr and asked for permission for them to ride. According to Stewart, he and Mike had a very brief conversation, during which Mike told him that they had done quite a bit of work near the old entrance, and |7if he and his son wanted to look at anything new, that was where they should go. Mike did not say anything about a hazard on that part of the property. Stewart also testified that he saw Michael Carr, Mike's son, get on the moped. At some point, Stewart testified, he indicated to Pruett that they had permission and that he could go on. A few minutes later, Stewart got on his four-wheeler and proceeded in the direction Pruett had gone, but Stewart stopped to look at some of the bulldozing that had been done, and Mike

Carr pulled up beside him in his van. Stewart testified that he and Mike then both proceeded to the swinging bridge, where they were having a pleasant conversation, until he heard a girl screaming. He could not see her because she was in a grove of trees, but as she got closer he heard her screaming his name. He quickly proceeded down the road on his four-wheeler, and as he came around the corner, he saw Pruett on all fours. Pruett's four-wheeler was up by the highway against some trees where a fence had stopped it.

Stewart testified that when he got close, he saw the cable, which he estimated to be a half-inch-wide cable. He testified that there were no markings or a sign on the cable, which was strung over a paved, well-defined path, and that it was not strung at the boundary of the property. He testified that he later determined the height of Pruett's injury and found that it was fifty-one or fifty-two inches off the ground. He testified that at that height, a cable would not stop a four-wheeler, as the handlebars are usually forty-two or forty-three inches in height. He acknowledged that he had used cables to block a path or a road on his property by placing the cable at a height designed for a vehicle to run into it and by marking the cable so others can see it.

Stewart testified that when Mike Carr arrived on the scene, he was admonishing his boys for not putting a flag on the cable and telling them to put flags on the other cables. Mike apologized and said that they should have had a flag on it. Stewart explained that they put Pruett in Mike's van and met an ambulance in Harrison, and Pruett was then transported to the emergency room. According to Stewart, the doctor told him that Pruett's trachea had been severed and had retracted down into his lungs, but the medical staff was able to secure it and stabilize him for transport. Stewart stated that he drove himself to Springfield, where Pruett was taken by helicopter. The doctors told Stewart that not only was Pruett's trachea severed, but his esophagus was severed as well. Pruett was kept in surgery most of the night, and a few days later, he also underwent surgery to repair his spine. Stewart explained that Pruett had to use a suction device and a feeding machine during his recovery and that Pruett's mother, who lived out of state, stayed with them for two months to help him care for Pruett. Stewart stated that Pruett still has problems with breathing and has limited movement in his neck. He testified that he has been responsible for Pruett's medical bills, which had so far totalled $233,000. On cross-examination, Stewart testified that he did not think Mike Carr had intended to hurt Pruett but that he had set a trap for Pruett. He testified that he found it implausible that a sixteen-year-old boy (meaning Michael Carr) hung the cable just because he did not know any better.

Michael Carr testified that he began work at the Dogpatch property in May 2005. He testified that he and his dad both volunteered to help his uncle, C.L. Carr, clean up the property, and that his dad was in charge of the project and hired several workers. He stated that they had problems keeping people off of the property and that he and his dad both spent time providing security for the property. Michael agreed that most of the problems came from four-wheelers coming onto the property, and he also agreed that the cable that injured Pruett was over a blacktop road in a grove of trees and not on the property boundary.

Michael testified that he recalled the incident in May 2005 involving Wes Cyrus, but he denied pointing a shotgun at him.

He testified that they were not using guns to protect the property, but that he was authorized to do things like hang the cable across the road as an agent of the property owner. He testified that he carried the cable to the location on his moped and strung the cable across the road. He recalled the Nances being on the property that day but denied that he passed Pruett and Jessica while they were stopped at "kissing rocks." According to Michael, he put the cable up just seconds before Pruett ran into it. He was coming down the hill on his moped when Pruett and Jessica were going up the hill, but he testified that he had no time to warn them about the cable. He testified that he did not know that the cable was going to harm Pruett, as the cable was at waist height and he believed that it would be level with the four-wheeler.

Michael testified that when he pulled up to the scene of the accident, his dad and Stewart were putting Pruett into the van. He testified that he did not remember his dad yelling at him about putting flags on the cables. He also testified that he could not reconcile his statement that he hung the cable at three feet with the fact that it made no contact with the four-wheeler. He acknowledged that he knew the cable was not marked with flags, that the cable was not at the boundary of the property, that he knew there were guests on the property that were driving on the paved roads on the property, and that he knew they were driving up the hill after he hung the cable. He testified that it occurred to him after he hung the cable that he ought to mark it with something.

On cross-examination, Michael testified that when he left after putting up the cable, he was going to get some yellow marking tape or caution tape. He also testified that he had made the decision to put up the cable on his own and did not talk to anyone about it before doing so. He explained that when he got to his dad's van to get the caution tape, he heard Jessica Voros screaming. His dad and Stewart took off, and he followed them on foot. After they took Pruett away in the van, he helped Jessica get a ride to the hospital and then took the cable down so no one else would get hurt. He testified that it did not occur to him at the time he put the cable up that it might hurt someone, but afterwards he realized that there was a potential for someone to get hurt and that is why he went to get the caution tape.

Mike Carr's deposition testimony was also admitted at the trial and portions of the deposition were read into the record. In his deposition, Mike testified that the Dogpatch property had been in the Carr family since 1993, and before that it was owned by his mother's family. He explained that he did not know who actually held the title to the property, but his brother, C.L. Carr, was generally in control of the property. He testified that he and his children, along with some of their friends, began cleaning up the property in June 2005.

Mike recalled the incident that occurred in May 2005 and stated that he caught several of the Nances on his property at 11:00 p.m. on four-wheelers. He stated that one of the boys (referring to Wes Cyrus) tried to run him and his son over with his four-wheeler several times, and he also stated that Pruett was there, too. Mike explained that he told the boys they were trespassing and that they should not be there. He also had his son call the police, and the police explained to the boys that they could leave, but if they came back on the property their four-wheelers would be confiscated. Mike denied that he or his son had a weapon of any kind. He stated that he made clear they were not welcome on the property.

Mike testified that he did not recall ever meeting Stewart or Pruett Nance prior to the day of the accident. He testified that on that day, Stewart pulled up on a four-wheeler and came over to speak to him, while Pruett was riding his four-wheeler around the parking lot and "cutting dough-nuts." Mike testified that Stewart began speaking to him, but that he immediately began walking toward his van because he wanted to go over to where Pruett was and tell him to stop what he was doing. Mike stated that Stewart did ask if they could ride on the property, but that he never answered yes or no. Mike explained that Stewart got back on his four-wheeler while he drove toward Pruett. At that point, Pruett and Jessica left the area on the four-wheeler, and according to Mike, they knew he was pursuing them. He drove through the property looking for them, and several minutes later, he saw Stewart stopped at the swinging bridge. Mike pulled up and talked to him for just a minute, and that was when they heard Jessica screaming. Mike stated that he had been following them in order to get them off the property and that Pruett had been evading him. He also stated that when he was sitting at the swinging bridge, his son Michael had approached and asked him for some caution tape. Mike testified that at the time, he did not know his son had put up the cable. He reiterated that Stewart and Pruett Nance did not have permission to be on the property and that he did not recall ever previously giving them permission to be on the property. But he acknowledged that he had never actually told the Nances to leave the property that day.

C.L. Carr, Sr., testified as to the ownership of the property and acknowledged that the property, which had been bought by GAC Investments, Inc., in 1995, was then assigned to Leisuretek Limited, a corporation owned by Ford Carr, C.L.'s brother. He also testified that the property was eventually deeded to Tahoe Gaming, LLC, a corporation owned by C.L. Carr, Jr. He testified that he did not tell Mike what to do on the property, but that he did give him checks written on Leisuretek's bank account to pay for materials for the clean-up.

At the conclusion of this testimony, the defense asked for a directed verdict on all the issues raised in the complaint. The defense asserted that the plaintiffs had failed to meet their burden of proof under the Arkansas Recreational Use Statute, codified at Arkansas Code Annotated section 18–11–301 et seq., which generally grants a landowner immunity from liability to persons entering the landowner's property for recreational purposes. However, an exception to this immunity exists "[f]or malicious, but not mere negligent, failure to guard or warn against an ultra-hazardous condition, structure, personal property, use, or activity actually known to the owner to be dangerous." Ark.Code Ann. § 18–11–307(1) (Repl.2003). So, for the plaintiffs to prevail, they were required to prove (1) that a failure to guard or warn occurred; (2) that the failure to guard or warn was malicious; (3) that a malicious failure to guard or warn occurred in relation to an ultra-hazardous condition; and (4) that the ultra-hazardous condition was actually known to the owner to be dangerous. The defense contended that the plaintiffs had failed to prove these elements, and argued specifically that there was no malice demonstrated and that the cable was not an ultra-hazardous condition or structure. The defense also asserted that the plaintiffs had failed to exercise reasonable care to avoid injury. The court, however, found that there was evidence that supported the elements of the cause of action and therefore denied the motion for directed verdict.

The defense then called Russ Rasnic, a mechanical engineer, to testify. Rasnic testified that he was asked to conduct a forensic examination of the accident. While acknowledging that he did not examine the trees until three years after the accident, he testified that he observed two distinct marks that were indicative of where the cable was strung between the trees. Based on the location of those marks, he pulled a tape measure between the two marks and stretched it taut, and the height of the cable at the center of the road was forty-six inches, which was consistent with Michael's testimony that he placed the cable at what he thought was waist height. Allowing for some sag in the cable, Rasnic testified that the height of the cable was between forty-two and forty-six inches. Rasnic also testified that Jessica's presence on the back of the four-wheeler had an effect on the significance of Pruett's injuries, because when he hit the cable, he stopped, but she was still traveling forward and pushed into the back of him.

At the close of all the evidence, the defense renewed its motion for directed verdict.[2] The court then discussed jury instructions with counsel, and the defense objected to an instruction on punitive damages, arguing that this was a statutory cause of action and there was nothing in the statute providing for punitive damages. The defense asserted that the instruction alluded to the "willful and wanton" language with regard to malice, which was not appropriate in this case. The court decided that the instruction would be read to the jury and included in the instruction would be both the standard for punitive

damages and the required elements under § 18–11–307(1) to establish liability.

The jury returned a verdict in favor of appellees, awarding Pruett $100,000 in compensatory damages and $150,000 in punitive damages. The jury awarded Stewart $400,000 in compensatory damages. Appellants filed a motion seeking remittitur and asserting that the proof adduced at trial established that Stewart's compensatory damages totaled $233,762.22.[3] The circuit court granted the motion for remittitur and reduced Stewart's compensatory damages to $233,707.42. The circuit court entered a judgment on October 21, 2008.

Appellants subsequently filed a motion for judgment notwithstanding the verdict, alleging that the evidence was insufficient to support the verdict. Specifically, appellants argued that appellees failed to present evidence of malice, the existence of an ultra-hazardous condition, or that Mike E. Carr and Michael L. Carr were acting as agents of C.L. Carr and C.L. Carr, Jr. The circuit court entered an order denying the motion, and appellants filed a timely, joint notice of appeal. As previously mentioned, however, the appeal was dismissed without prejudice by this court due to a lack of a final order, because there was no written order entered dismissing Lynn Larson as a plaintiff or dismissing Westek Corporation, Leisuretek, Ltd., Ford Carr, and Alberta Carr as defendants. On March 15, 2010, the circuit court entered an order of dismissal as to these parties, and appellants filed a notice of appeal on March 24, 2010. Appellees filed a notice of cross-appeal on March 31, 2010.

---

2. There was no specific ruling by the circuit court on this renewed motion for directed verdict; however, under Ark. R. Civ. P. 50(e), the motion is deemed denied for purposes of appellate review.

3. The amount of total medical bills introduced at trial was $233,707.42.

### I. Sufficiency of the Evidence

For their first point on appeal, appellants argue that the circuit court erred in denying their motion for judgment notwithstanding the verdict because appellees failed to prove the required elements under Ark.Code Ann. § 18–11–307(1). Specifically, appellants assert that appellees failed to present substantial evidence of malicious intent, an ultra-hazardous condition, or knowledge on the part of the landowner. Our standard of review for a denial of a motion for judgment notwithstanding the verdict is well settled:

> [I]n reviewing the denial of a motion for [judgment notwithstanding the verdict], we will reverse only if there is no substantial evidence to support the jury's verdict, and the moving party is entitled to judgment as a matter of law. Substantial evidence is that which goes beyond suspicion or conjecture and is sufficient to compel a conclusion one way or the other. It is not our place to try issues of fact; rather, we simply review the record for substantial evidence to support the jury's verdict. In determining whether there is substantial evidence, we view the evidence and all reasonable inferences arising therefrom in the light most favorable to the party on whose behalf judgment was entered. A motion for directed verdict should be denied when there is a conflict in the evidence, or when the evidence is such that fair-minded people might reach different conclusions.

ConAgra Foods, Inc. v. Draper, 372 Ark. 361, 364, 276 S.W.3d 244, 247–48 (2008) (internal citations omitted).

### A. Malicious Intent

Appellants first argue that, in considering a landowner's failure to warn, the recreational user's negligent conduct must also be considered. Appellants cite Roten v. United States, 850 F.Supp. 786 (W.D.Ark.1994), as recognizing the inconsistency in requiring a landowner to take extra precautionary measures to guard or warn against a condition on the property when it is the recreational user's own negligent conduct that causes the user's injuries. In Roten, the decedent fell to his death off of a cliff at night in a national recreational area, but the court found that the National Park Service had not maliciously failed to warn against an ultra-hazardous condition known by the Service to be dangerous concerning the cliffs. The court found that the placement of additional warning signs in the area would have provided no more or better warning than the decedent's own sensory perceptions in viewing the cliffs in the daylight prior to his fall. The court also found that

> if the defendant were required to install such guard rails or fences along the high cliffs of White Rock the said obvious purposes of the Recreational Use Statute would be defeated and frustrated, not because defendant would otherwise be held to be acting maliciously, but because those using the recreational areas were being negligent and irresponsible in their use of the area.

Id. at 794. Appellants urge that this language supports a finding that Pruett's injuries were caused by his own negligent conduct and not by a failure on the part of appellants. Specifically, appellants argue Pruett was negligent in not wearing a helmet, riding with a passenger on his four-wheeler, and not keeping a proper look-out.

Appellants also discuss a couple of other federal cases that have touched on the meaning of "malice" in the context of a recreational use statute. In Carlton v. Cleburne County, Arkansas, 93 F.3d 505 (8th Cir.1996), the victims of a bridge collapse sued a nearby resort for negligence,

alleging that the resort had failed to warn them of an ultra-hazardous danger. The resort was granted summary judgment, and the appellate court affirmed. The court noted that, under Arkansas law, "malice" is inferred where "the negligent party knew, or had reason to believe, that his act of negligence was about to inflict injury, and that he continued in his course with a conscious indifference to the consequences." *Id.* at 511 (quoting *Stein v. Lukas,* 308 Ark. 74, 78, 823 S.W.2d 832, 834 (1992)). The court held that there had been no facts offered to support a finding that the resort had maliciously failed to warn, because there was no evidence that the resort knew the bridge was about to collapse yet continued its course of conduct with a conscious indifference to the consequences.

Appellants also cite to *Cudworth v. Midcontinent Communications,* 380 F.3d 375 (8th Cir.2004), which applied North Dakota law but presents a situation somewhat factually similar to the case at bar. In *Cudworth,* a snowmobile rider was injured when he collided with a rope barrier, which was partially obscured by a snowdrift, that the defendant had strung across its property boundary. The district court granted summary judgment in favor of the defendants, and the Eighth Circuit agreed that the defendants were immune from liability under North Dakota's recreational-use statute (which is worded similarly to the Arkansas statute). Specifically, the district court concluded that "malicious" conduct required proof of actual malice or evil intent, but the appellants urged a broader definition that also encompassed "presumed malice" which exists "where the defendant's conduct amounts to a reckless disregard of the rights of others." *Id.* at 381 (quoting *Slaubaugh v. Slaubaugh,* 466 N.W.2d 573, 581 (N.D.1991)). The Eighth Circuit disagreed and found that if the legislature had intended to allow liabil-ity for presumed malice or reckless disregard in the recreational use immunity statute, it would have stated so.

Likewise, because no Arkansas court has yet interpreted the meaning of "malicious" in § 18–11–307(1), appellants urge this court to interpret the statute according to its "plain meaning" and find that the legislature only intended the statute to apply to actual malice, meaning the intentional doing of a wrongful act without justification or excuse, as opposed to implied malice. And, appellants argue, in this case there was no actual malice proven. Specifically, appellants dispute that the height of the cable can be used as evidence of malice, as it was only intended to prevent access to portions of the property and was not intended to harm anyone. Appellants argue that appellees' contention that the cable was a "trap" is mere suspicion or conjecture and that the evidence presented at trial might prove negligence, at best, but not malicious intent.

In response, appellees argue the converse of appellants' argument: appellees argue that if the legislature wanted to limit the exception to immunity to situations involving "actual malice," then it would have used that term in the statute. To illustrate, appellees cite several statutes in which the term "actual malice" is used. *E.g.* Ark.Code Ann. § 5–26–502(e); § 12–13–303(e). Appellees urge that this court should interpret "malicious" in the recreational-use statute as including inferred malice, as the Eighth Circuit did in *Carlton, supra.* Appellees also note that this interpretation of malice is the same as that used in Ark.Code Ann. § 16–55–206, which explains the standard for an award of punitive damages under the Civil Justice Reform Act. Finally, appellees contend that under either an inferred malice or an actual malice standard, there was substantial

evidence to support the jury's finding of malice in this case.

We affirm on this point. First, any question regarding Pruett's contributory negligence, if any, was a question for the jury. Second, as explained at length by the circuit court in its order denying the motion for judgment notwithstanding the verdict, "[t]here was evidence from which, under the circumstances, it could have been determined that there was knowledge of the hazard and opportunity to warn and that it was not done; that there was malicious failure to warn." The jury was not instructed as to the meaning of "malicious," and because this case was submitted to the jury under a general verdict form, this court can only speculate on how the jury defined "malicious." When a jury's verdict is rendered on a general verdict form, it is a finding upon the whole case; this court will not speculate on what the jury found where a general jury verdict is used. *Union Pac. R.R. Co. v. Barber*, 356 Ark. 268, 293, [20]149 S.W.3d 325, 341 (2004) ("When special interrogatories concerning liability or damages are not requested, and this court is left in the position of not knowing the basis for the jury's verdict, we will neither question nor theorize about the jury's findings."). Furthermore, as we have no specific ruling below on the correct statutory interpretation of "malicious," we decline to address the issue at this time.

### B. Ultra-hazardous Condition

In this case, the jury was instructed that a condition is ultra-hazardous if it (1) cannot be performed without a risk of serious harm to the person or another, regardless of any precautions taken; and (2) does not normally occur in that community. On appeal, appellants argue that there was no substantial evidence presented that the use of a cable to limit access to the property was an ultra-hazardous condition or activity. Appellants assert that the usage of a cable for such a purpose does not necessarily involve a risk of serious harm, because any such risk can be eliminated by the exercise of due care on the part of the landowner. Michael Carr testified that he was going to retrieve caution tape to attach to the cable at the time the accident occurred; thus, appellants contend that if he had had sufficient time to flag the cable, "the accident would have been unlikely to occur." Also, appellants argue, there was evidence presented that it is common practice to install cables as barriers to prevent entry upon land. Stewart Nance's friend, Dean McKnight, and Stewart himself testified that they had previously used cable to prevent access to property. Therefore, the use of the cable in this case cannot be considered an ultra-hazardous activity or condition.

[1]In response, appellees argue that whether the hazard can be eliminated by reasonable efforts and whether it is a common practice are not relevant considerations. But this argument is unavailing, considering that those considerations track the meaning of ultra-hazardous as defined by the jury instruction, which appellees did not object to below. Appellees also cite cases from other jurisdictions that support a finding that stringing an unmarked cable in such a way is a dangerous and ultrahazardous activity. *See, e.g., Seeholzer v. Kellstone, Inc.*, 80 Ohio App.3d 726, 610 N.E.2d 594 (1992) (reversing grant of summary judgment to landowner where driver of recreational vehicle was injured when he struck cable strung across pathway on landowner's property).

In its order denying the motion for judgment notwithstanding the verdict, the circuit court stated:

It does not appear that stretching a well-marked cable of a reasonable height

across a road in an area where it is reasonably visible to persons traveling the road is an ultrahazardous activity and it appears that such action is done commonly. But here, substantial evidence provides a basis for finding that maintaining a cable like the one claimed to have been installed, under the circumstances shown, is not a matter of common usage and necessarily involved a risk of serious harm to the person of Pruett Nance or any others who might be riding on the road under the conditions as then existed. From the record it appears that it could be found that ordinary care would have reduced the risk of harm, but, under the circumstances presented, it would not eliminate it.

We agree with this analysis. It was not the hanging of a cable per se that constituted the ultra-hazardous activity, but the hanging of an unmarked cable at a dangerous height in an area in which the landowner knows there are people traveling on four-wheelers. Therefore, we affirm on this point.

### C. Agency Relationship

Finally, appellants argue that appellees failed to present substantial evidence of the existence of an agency relationship between Mike and Michael Carr and the other appellants. Specifically, appellants assert that there was no evidence offered to show that Mike or Michael Carr were employees or agents of Tahoe Gaming, LLC. Appellants also argue that C.L. Carr and C.L. Carr, Jr., are not personally liable for the obligations of Tahoe Gaming because appellees did not seek to pierce the corporate veil.

However, appellants failed to raise this argument during the trial and only did so for the first time in their motion for judgment notwithstanding the verdict. A motion for judgment notwithstanding the verdict is technically only a renewal of the motion for directed verdict made at the close of the evidence; therefore, it cannot assert a ground not included in the directed-verdict motion. *Advanced Envtl. Recycling Techs., Inc. v. Advanced Control Solutions, Inc.,* 372 Ark. 286, 275 S.W.3d 162 (2008). Any arguments made in a motion for judgment notwithstanding the verdict that were not made in the motion for directed verdict may not be taken up on appeal; the arguments made in the directed-verdict motion are controlling. *Id.* Therefore, we find that this argument is not preserved for this court's review.

### II. *Jury Instruction*

As explained above, appellants objected to the instruction on punitive damages, arguing that this was a statutory cause of action and that there was nothing in the statute providing for punitive damages. Appellants also argued that the statute allows liability only for "malicious" failure to warn, but that the instruction alluded to the "willful and wanton" language with regard to malice, which was not appropriate in this case. The court decided that the instruction would be read to the jury and included in the instruction both the standard for punitive damages and the required elements to establish liability under § 18–11–307(1).

On appeal, appellants again assert that the court erred in giving the punitive-damages instruction, arguing that it was "misleading and confusing to the jury and provided an inappropriate standard for the imposition of punitive damages in light of the malice required" under the recreational-use statute. A party is entitled to a jury instruction when it is a correct statement of the law and when there is some basis in the evidence to

support giving the instruction. *Vidos v. State,* 367 Ark. 296, 239 S.W.3d 467 (2006). We will not reverse a circuit court's decision to give an instruction unless the court abused its discretion. *Id.*

In support of their argument, appellants cite to *Wal–Mart Stores, Inc. v. Binns,* 341 Ark. 157, 15 S.W.3d 320 (2000). In *Binns,* an employee filed negligent prosecution, abuse of process, and malicious prosecution claims against her employer. The jury returned a verdict in the employee's favor on the abuse of process and malicious prosecution claims and awarded her $750,000 in compensatory damages and $2,000,000 in punitive damages. On appeal, Wal–Mart argued that the court had erred in instructing the jury to award punitive damages if they found that Wal–Mart had *"intentionally pursued* a course of conduct for the purpose of causing damage." *Id.* at 164, 15 S.W.3d at 325 (emphasis in original). Wal–Mart argued that the use of this instruction created an inconsistent standard for awarding punitive damages when the underlying tort involves malice. This court agreed and explained that

> the underlying claim of malicious prosecution (which could have formed the sole basis for the challenged punitive-damages award), requires that the plaintiff prove intent and a spirit of ill will, hatred, or revenge. However, the jury instruction submitted inconsistently permits an award based on a lesser degree of scienter, merely proof that the defendant *intentionally* pursued a course of conduct for the purpose of causing damage.

*Id.* at 164–65, 15 S.W.3d at 325 (emphasis in original). Thus, this court held that the *circuit court had erred in submitting the* instruction and reversed.

Appellants assert that a similar situation is presented in the case at bar. Arkansas Code Annotated section 18–11–307(1) allows recovery only when there has been "malicious, but not mere negligent, failure to guard or warn against an ultra-hazardous condition ... actually known to the owner to be dangerous." But under the jury instruction given, appellants argue, the jury was allowed to award punitive damages if it found liability under the statute and it found that "the Defendants knew or ought to have known, in light of the surrounding circumstances, that their conduct would naturally and probably result in injury and that they continued such conduct with malice in reckless disregard of the consequences from which malice may be inferred." Alternatively, the jury could award punitive damages if it found that the defendants "intentionally pursued a course of conduct for the purpose of causing injury." Appellants argue that the statute makes no reference to presumed malice, reckless disregard, or mere intentional conduct, and instructing the jury to award punitive damages under these "lesser standards" was error.

In response, appellees contend that there was no error in the instruction because implied malice is allowed under the statute, thus the standard for imposing punitive damages is the same standard for finding malice under the statute. Appellees also point out that § 18–11–307 states that "[n]othing in this subchapter limits in any way liability which otherwise exists" for malicious failure to guard or warn, so regardless of which definition of "malicious" is used, punitive damages is an available remedy if liability is found under the statute.

While appellants contend that the jury instruction allowed the jury to award punitive damages under a lesser standard, akin to *Binns,* the situation in this case is distinguishable. In *Binns,* the jury instruction included an "intentional" standard,

which was a lesser standard than that required for a finding of malicious prosecution. But in this case, the "higher" standard found in the statute itself was made a part of the instruction, thus eliminating the problem that was present in *Binns*. Regardless of the other language included in the instruction, the jury was still instructed that it first had to find that the defendants had acted with malicious intent under the language of section 18–11–307(1) in order to award punitive damages. Thus, we find no abuse of discretion on this point and affirm.

### III. *Cross–Appeal*

On cross-appeal, appellees assert that the circuit court erred in granting appellants' motion for remittitur. We review the issue of remittitur de novo. *See Advocat, Inc. v. Sauer*, 353 Ark. 29, 111 S.W.3d 346 (2003). Where an award of damages is alleged to be excessive, this court reviews the proof and all reasonable inferences most favorably to the appellee and determines whether the verdict is so great as to shock the conscience of the court or demonstrate passion or prejudice on the part of the trier of fact. *Id.* Remittitur is appropriate when the compensatory damages awarded are excessive and cannot be sustained by the evidence. *Id.* The standard of review in such a case is that appropriate for a new trial motion, i.e., whether there is substantial evidence to support the verdict. *Id.*

In its order granting the motion for remittitur, the circuit court noted that Stewart Nance had testified that his only claim was for the medical bills that he had paid on Pruett's behalf. And, during closing arguments, plaintiffs' counsel reiterated that all they were asking for was damages to cover the amount of medical bills. Further, there was no evidence presented to show the value of any services rendered or any expenditures made by Stewart beyond the $233,707.42 in medical bills. Considering all these factors, the court found that the $400,000 damages verdict in favor of Stewart was grossly excessive and lacked a sufficient evidentiary basis.

Appellees argue that, while there was no proof offered of the monetary value of the services rendered by Stewart in his care of Pruett, the jury was instructed that it should compensate Stewart for "the reasonable expense of any necessary medical care, treatment, and services received, including transportation and board and lodging expenses necessarily incurred in securing such care, treatment, or services on behalf of Pruett Nance." Clearly, by awarding Stewart $400,000, the jury decided to compensate Stewart for his transportation, lodging, and the value of his caretaking activities for Pruett during Pruett's recuperation. Appellees also note that appellants did not object to the above instruction, which they argue is a "waiver of any complaint that insufficient evidence existed to support awarding for these amounts." Appellees also argue that, contrary to the circuit court's opinion, they were not required to present proof of the value of all those services to recover for them. Furthermore, appellees assert that neither Stewart's testimony that he was only seeking damages for medical expenses, nor his counsel's statement during closing argument, should be construed as precluding the jury from considering the caretaking efforts by Stewart and awarding him accordingly.

In response, appellants first deny that their remittitur argument was waived by failure to object to the jury instruction on compensatory damages. Appellants argue that the jury instruction was not at issue; the issue was whether there was sufficient evidence to support the jury's award. Appellants cite to this court's case law stating

that damages must be proven with specificity, namely in terms of dollars and cents. Appellants assert that, even assuming that the excess award was to cover Stewart's expenses for transportation, lodging, and caretaking, which is unclear considering the jury rendered only a general verdict, appellees presented no evidence of his transportation and lodging costs or the value of caretaking services. Appellants contend that appellees presented and asked for compensation only for the medical bills, and any award in excess of that was properly remitted.

First, we agree with appellants that their argument on this point has not been waived. Appellants' argument was not that there was an error in the instruction; the argument was that there was no evidence to support an award in excess of Stewart's medical bills. Second, appellants are correct that this court has stated that the plaintiff must present proof that would enable the jury to fix damages in dollars and cents, and damages will not be allowed which are speculative, resting only upon conjectural evidence or the opinion of the parties. *Mine Creek Contractors, Inc. v. Grandstaff*, 300 Ark. 516, 780 S.W.2d 543 (1989). But this court has also stated that in those instances where damages simply cannot be proven with exactness, when the cause and existence of damages have been established by the evidence, recovery will not be denied merely because the damages cannot be determined with exactness. *Id.*

Considering the above law and our standard of review for grants of remittitur, we find that the jury was entitled to award damages for the caretaking activities undertaken by Stewart as well as other costs and that the verdict given was not so great as to shock the conscience of the court or demonstrate passion or prejudice on the part of the jury. We therefore reverse the order granting remittitur and remand for the circuit court to reinstate the original compensatory-damages award of $400,000.

Affirmed on direct appeal; reversed on cross-appeal.