# United States Court of Appeals

## For the Eighth Circuit

_____

No. 17-1928

_____

Swan B. Moss, III, Individually and as Co-Administrator of the Estate of G.Y.M.,
Deceased and On Behalf of Wrongful Death Beneficiaries of G.Y.M. Estate of
G.Y.M.; Gay Cunningham Moss, Individually and as Co-Administrator of the
Estate of G.Y.M., Deceased and On Behalf of Wrongful Death Beneficiaries of
G.Y.M. Estate of G.Y.M.; Kerri Basinger, Individually and as Administratrix on
behalf of Shane Edward Basinger Estate on behalf of Jadyn Rhea Basinger Estate
on behalf of Kinsley Ann Basinger Estate; Anthony Lynn Shumake, Administrator
of the Estates of Robert Shumake, deceased, Wilene Shumake, deceased, and N.S.,
deceased, and on Behalf of Wrongful Death Beneficiaries of Robert Shumake,
deceased, Wilene Shumake, deceased, and N.S., deceased Estate of Robert
Shumake Estateof Wilene Shumake Estate of N.S; Tara Roeder, Administratrix of
the Estate of Deborah Busby Roeder, and on behalf of the wrongful death
beneficiaries of Deborah Busby Roeder Estate of Deborah Busby Roeder; Natisha
L. Rachal, on behalf of T.A.; Jerry Don McMaster, Individually and On Behalf of
the Estate of Debra Wynne McMaster and His Minor Children, A.C.M. and
E.C.M. Estate of Debra Wynne McMaster on behalf of A.C.M. on behalf of
E.C.M.; Christy Pugh Basinger, on behalf of K S B; Benjamin L. Pate, on behalf
of B.L.; Aaron Sultz, Individually and as Special Administrator of the Estate of
Eric Wayne Sultz, on behalf of The Estate of Eric Wayne Sultz, Deceased, and
Statutory Wrongful Death Beneficiaries of Eric Wayne Sultz Estate of Eric Wayne
Sultz; Tara Roeder, as the Administratrix of the Estate of Bruce Wayne Roeder,
and on behalf of the wrongful death beneficiaries of Bruce Wayne Roeder Estate
of Bruce Wayne Roeder; Amanda Baker Willis, Individually and as Administrator
of the Estates of K.S., deceased, and Julie Freeman, deceased, and on behalf of the
wrongful death beneficiaries of K.S. and Julie Freeman Estate of K.S. Estate of
Julie Freeman; Judith N. Pate, on behalf of B.L.; Adam Jez, Individually &as
Administrator of the Est of Leslie Jez, Decd, obo Est of & Wrongful Death
Beneficiaries of Leslie Jez, &Adam Jez, Individually &as Administrator of the Est
of KJ, Decd, obo Est & Wrongful Death Beneficiaries of KJ Estate of KJ Estate of
Leslie Jez; Susan Johnson, Administrator of the Estate of Sheri Wade, Deceased,
on behalf of the Estate of Sheri Wade, and on behalf of the Wrongful Death

Beneficiaries of Sheri Wade Estate of Sheri Wade; Candace Smith, individually and as Administratrix on behalf of Anthony Keith Smith Estate on behalf of Joseph Paul Smith Estate on behalf of Katelynn Nicole Smith Estate; Theresa Roeder, as the Administratrix of the Estate of Esther Kay Roeder, deceased, and on behalf of the wrongful death beneficiaries of Esther Kay Roeder Estate of Esther Kay Roeder

*Plaintiffs - Appellants*

v.

United States of America; United States of America, Acting By and Through the Department of Agriculture, U.S. Forest Service, also known as Department of Agriculture, also known as U.S. Forest Service

*Defendants - Appellees*
_____

Appeal from United States District Court
for the Western District of Arkansas - Texarkana
_____

Submitted: February 13, 2018
Filed: July 20, 2018
_____

Before LOKEN, BENTON, and ERICKSON, Circuit Judges.
_____

ERICKSON, Circuit Judge.

This case arises from the tragic flooding of the Little Missouri River in the Albert Pike Recreation Area ("Albert Pike") which is located in the Arkansas portion of Ouchita National Forest. Albert Pike is an outdoor camping and recreation site covering over two hundred acres of land, including portions of the Little Missouri River. On the night of June 11, 2010, an intense storm system caused rapid and

serious flooding of the river. The rising water submerged several campsites within Albert Pike, resulting in the death of twenty campers.

This appeal stems from eleven consolidated lawsuits alleging negligence and malicious conduct by the United States related to the development and maintenance of Albert Pike. The district court[1] granted the United States's motion to dismiss for lack of subject matter jurisdiction under the Federal Tort Claims Act ("FTCA"). After a careful review of the record, we affirm.

## I.    Background

Albert Pike is a large outdoor camping and recreation site. Winding through the site is the Little Missouri River, which gives visitors the opportunity to engage in popular recreational activities including fishing, canoeing, and swimming. The site also contains fifty-four campsites placed over four loops, marked as Loops A, B, C, and D. In 2010 it cost prospective campers $10 to secure a campsite overnight in Loops A, B, and C, and $16 to secure a site in Loop D. Loop D's higher cost was in part due to its developed campsites, which included electrical and water hookups for RVs.

The Loop D campsites were constructed as part of a renovation and expansion project for Albert Pike launched by Congress in 2001. The project allocated over $600,000 to renovate sites in Loop C and to build Loop D campsites. The redevelopment project was headed by District Ranger James Watson. The National Environmental Policy Act of 1969, 42 U.S.C. § 4321, required Watson to prepare an environmental assessment of the project. See 36 C.F.R. § 218.2. As part of that

---

[1]The Honorable Susan O. Hickey, United States District Judge for the Western District of Arkansas.

assessment, Watson put together a team including two "watershed specialists": Ken Luckow, a soil scientist, and Alan Clingenpeel, a hydrologist.

Luckow and Clingenpeel were each consulted for their opinion as to whether any of the proposed campsites in Loop D would fall within a floodplain. Luckow, the soil scientist, prepared an initial report that concluded that "most of the area where the new campsites are proposed . . . should be considered as being within the 100-year floodplain." As a result, he recommended that any campsite in Loop D should be primitive. He explicitly recommended that any campsite should lack electrical and water hookups. He also recommended placing signs to warn campers of potential flooding.

Ranger Watson wanted to build developed campsites within Loop D, in part due to a desire to put the appropriated funds to good use and in part to meet public expectations surrounding the project. Presented with Luckow's position, Watson sought a second opinion. Watson took Clingenpeel – the hydrologist – in person to the planned site for Loop D. Watson then asked him if he believed the proposed campsite would fall within the 100-year floodplain. Clingenpeel visually estimated the floodplain using the "double bankfull" method (which Clingenpeel himself describes as only a "quick estimate" of the floodplain). Relying on that estimate, Clingenpeel told Watson it was unlikely there would be flooding issues if all renovations took place above the sighted floodplain.

Watson prepared a draft environmental assessment to submit for the project. The draft environmental assessment was circulated to various Forest Service offices, as well as Luckow and Clingenpeel. The environmental assessment partially included Luckow's floodplain analysis, but ultimately contradicted Luckow by stating that the proposed Loop D campsites would not fall within the 100-year floodplain. Despite the environmental assessment's final conclusion that the campsite would not fall within a floodplain, the environmental assessment still recommended posting signs

to warn of flash floods. Clingenpeel offered no edits to the draft, while Luckow made only minor changes. The final environmental assessment was submitted. The Forest Service then filed a decision notice (signed by Ranger Watson) approving the project, including the creation of developed campsites within Loop D. The decision notice made no reference to the floodplain or the need to place signs. No signs were ever posted. Loop D opened for campers in 2004.

Occasionally the Little Missouri River would rise, prompting minor flooding concerns for different campsites. Ranger Watson moved campers in Loop C on three different occasions in 2006-07 due to light flooding. An incident report from 2008 suggests that campers upstream from Loop D once requested assistance after rising waters washed their camping supplies downstream. Of ten documented flooding events in Albert Pike between 1940 and 2010, none inflicted any reported injuries and only one occurred near Loop D.

\* \* \*

On the night of June 11, 2010, a strong storm system moved slowly toward Albert Pike. The storm created flash flood conditions within the Little Missouri River channel. By the time signs of flooding were readily apparent, many campers were asleep at their campsites. Many of those who were awake decided to hunker down in their vehicles. As the water continued to rise, some campers began to realize that their vehicles might be at risk from the flood and attempted to move to higher ground. Several families sought refuge in nearby trees.

Over the course of the next several hours, catastrophic flooding claimed the lives of twenty campers. Some of the campers who attempted to take refuge in the trees were wrested away by the rising tide of the floodwaters. Other families, some of which included three generations, attempted to make it through the storm in their vehicles, but perished when the flood swept the vehicles away. Seventeen of the

campers who lost their lives were camping in Loop D, with the other three just upstream. A U.S. Geological Survey expert described the flood's intensity as exceeding a "500-year flood event."

The plaintiffs in this case filed claims under the FTCA related to the development and maintenance of the Loop D campsites. The United States moved to dismiss, claiming they were entitled to immunity under the Arkansas Recreational Use Statute ("ARUS") and so the FTCA deprived the district court of jurisdiction. See, e.g., Wilson v. United States, 989 F.2d 953, 955-56 (8th Cir. 1993) (explaining that "the United States is entitled to the benefit of state recreational use statutes, if applicable, when it is sued under the Federal Tort Claims Act"). The district court asked the Arkansas Supreme Court to accept certification of this question: "Whether 'malicious' conduct[] under [the Arkansas Recreational Use Statute] includes conduct in reckless disregard of the consequences from which malice may be inferred." The Arkansas Supreme Court accepted certification and answered in the affirmative. Roeder v. United States, 432 S.W.3d 627 (Ark. 2014).

Once the certified question was answered, the district court consolidated the cases. The United States renewed its motion to dismiss for lack of jurisdiction. The district court allowed limited discovery related to jurisdictional issues. After discovery was complete, plaintiffs filed their opposition to the motion to dismiss. The United States replied including testimonial declarations from three witnesses who had not been deposed. Plaintiffs moved to strike the declarations, or in the alternative, to be allowed to depose the three witnesses.

On March 28, 2017, the district court granted the United States's motion to dismiss for lack of jurisdiction and denied plaintiffs' motion to strike the declarations. The district court held that the United States was entitled to immunity under the ARUS. As a result, the district court held that it lacked subject matter jurisdiction under the FTCA. Plaintiffs appeal.

## II.    Discussion

### A.    Standard of Review

Plaintiffs appeal the district court's grant of the United States's motion to dismiss for lack of jurisdiction under Fed. R. Civ. P. 12(b)(1). Motions under 12(b)(1) may assert either a "facial" or "factual" attack on jurisdiction. Where, as here, a party brings a factual attack, a district court may look outside the pleadings to affidavits or other documents. See Harris v. P.A.M. Transport, Inc., 339 F.3d 635, 637, 637 n.4 (8th Cir. 2003). "This does not . . . convert the 12(b)(1) motion to one for summary judgment." Id. at 637 n.4. Instead, the party invoking federal jurisdiction must prove jurisdictional facts by a preponderance of the evidence. OnePoint Solutions, LLC v. Borchert, 486 F.3d 342, 347 (8th Cir. 2007). Those factual findings are reviewed for clear error. Osborn v. United States, 918 F.2d 724, 730 (8th Cir. 1990) (citing Williamson v. Tucker, 645 F.2d 404, 413 (5th Cir. 1981)).

"Thus, the Rule 12(b)(1) procedure enables the court to resolve a threshold jurisdictional issue without the need for trial, unless the issue is 'so bound up with the merits that a full trial on the merits may be necessary to resolve the issue.'" Disability Support All. v. Heartwood Enterprises, LLC, 885 F.3d 543, 547 (8th Cir. 2018) (quoting Crawford v. United States, 796 F.2d 924, 929 (7th Cir. 1986)). If the jurisdictional issue is "bound up" with the merits it remains within the district court's discretion to decide whether to evaluate the evidence under the summary judgment standard. See Gulf Oil Corp. v. Copp Paving Co., 419 U.S. 186, 203 n.19 (1974) (explaining that when there is "an identity between the jurisdictional issues and certain issues on the merits" a district court may apply the summary judgment *de novo* standard) (internal quotation marks omitted).

The FTCA confers subject matter jurisdiction for suits against the United States in "circumstances where the United States, if a private person, would be liable to the

claimant in accordance with the law of the place where the act or omission occurred." FDIC v. Meyer, 510 U.S. 471, 477 (1994) (quoting 28 U.S.C. § 1346(b)). The "private analogue" requirement is echoed in the section of the statute explaining the federal government's liability. See 28 U.S.C. § 2674 ("The United States shall be liable . . . in the same manner and to the same extent as a private individual under like circumstances . . .").

The district court made several findings of fact by a preponderance of the evidence. Plaintiffs assert that because jurisdiction under the FTCA is "intertwined with" the merits question of the applicability of the ARUS to the plaintiffs' claims, the district court abused its discretion by failing to apply a summary judgment standard when considering the evidence. The United States responds by saying that plaintiffs' argument is immaterial, as dismissal was appropriate under either standard.[2] We need not decide whether the district court applied the correct standard, as jurisdiction is lacking even when the facts are viewed under the summary judgment standard.

### B.    Immunity under the ARUS

Because the FTCA removes immunity from the United States only in those circumstances in which a private landowner would be liable, we must decide whether an individual landowner would receive immunity from plaintiffs' claims under the ARUS. See 28 U.S.C. § 1346(b). "The purpose of [the ARUS] is to encourage

---

[2]The United States also suggests that plaintiffs did not clearly object in the district court to the proposed standard of review, thereby waiving any argument over the correct standard. We doubt that plaintiffs' argument was waived. Individual plaintiffs repeatedly identified the proposed standard in their briefs before consolidation of the cases. Those arguments were then incorporated in their joint response. Because we affirm the district court, however, we decline to reach this issue.

owners of land to make land and water areas available to the public for recreational purposes by limiting their liability toward persons entering thereon for such purposes." Ark. Code. Ann. § 18-11-301 (2016). "Generally, the ARUS provides immunity from liability to landowners who make their property available for the recreational use of others." Roeder, 432 S.W.3d at 630. There are two main exceptions: 1) when "the landowner charges the person entering the land for recreational use," and 2) "when the landowner maliciously fails to guard or warn against an ultrahazardous condition, structure, use, or activity actually known to the landowner to be dangerous." Id. (citing Ark. Code Ann. § 18-11-307 (2016)). We consider each exception in turn.

## 1. The "Charge" Exception

The ARUS generally does not provide immunity "[f]or injury suffered in any case in which the owner of land charges the person or persons who enter or go on the land for the recreation use thereof . . ." Ark. Code Ann. § 18-11-307(2) (2016). The statute defines a "charge" as an "admission fee for permission to go upon or use the land." Ark. Code Ann. § 18-11-302(2) (2016). The parties dispute whether the $16 fee to secure a campsite in Loop D is an "admission fee" that "charged" the plaintiffs for their recreational use of Loop D.

The United States suggests that previous decisions involving similar statutes enacted in other states compel an interpretation of the statute that excludes campsite rental fees from qualifying as "admission" fees. See, e.g., Wilson v. United States, 989 F.2d 953, 957 (8th Cir. 1993) (holding that a $2 fee to stay in a building on a military base did not remove immunity under the Missouri recreational use statute); see also Garreans v. City of Omaha, 345 N.W.2d 309, 313 (Neb. 1984) (holding campsite rental fees were not admissions fees under Nebraska's recreational use statute), overruled on other grounds by Bronsen v. Dawes Cty., 722 N.W.2d 17 (Neb. 2006). We are mindful that "[t]he interpretation of the various recreational use

statutes is controlled by the precise language of each statute." Wilson, 989 F.2d at 956. We also acknowledge that we are bound by authoritative constructions of state law by a state's highest court – constructions that might differ from state to state, even when different statutes include similar language. See Eichenwald v. Small, 321 F.3d 733, 736 (8th Cir. 2003), as corrected (May 21, 2003) ("When deciding matters of state law, we are bound by the decisions of the state's highest court, and, to the extent that a precise issue has not been addressed by that court, we must determine its probable decision on the issue by reference to its analogous case law, relevant decisions of the state's lower courts, and other potentially elucidating state law materials."). Finally, the Arkansas Supreme Court's decision in Roeder suggests that the ARUS should be construed strictly to avoid an overbroad grant of immunity. 432 S.W.3d at 634.

Even construing the ARUS strictly, however, the Loop D campsite fee does not qualify as an "admission fee" under the statute. Plaintiffs focus on the fact they were injured while camping – the exact activity for which they paid the use fee. But the ARUS, by its plain terms, removes immunity only when a fee is charged to enter a particular area. See, e.g., OXFORD ENGLISH DICTIONARY (3d ed. 2004 & online version 2011) ("admission": "[t]he process or fact of entering or being allowed to enter a place . . ."), http://www.oed.com/view/Entry/2584; WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 28 (1971) ("admission": "permission or right to enter . . ."; "price of entrance; fee paid at or for entering"). Fees subsequent to entry, such as charges to access services such as water or electrical hookups, do not alter the initial grant of immunity. Those fees are not required for "entrance" to the relevant parcel of land. The United States represents (and the record supports) that the $16 overnight campsite fee was solely for access to particular campsite services and that campers who didn't pay the fee could still access Loop D. See Oral Argument at 20:49, http://media-oa.ca8.uscourts.gov/OAaudio/2018/2/171928.MP3 ("Even with respect to Loop D . . . people who haven't paid a campsite fee can go into Loop D

[and] they can use the bathhouse").  Under the plain language of the statute, the charge exception does not apply to the Loop D fees.[3]

## 2.     The "Failure to Guard or Warn" Exception

The ARUS's other exception denies immunity "for malicious, but not mere negligent, failure to guard or warn against an ultra-hazardous condition, structure, personal property, use, or activity actually known to the owner to be dangerous." Ark. Code Ann. § 18-11-307(1) (2016).  An activity is ultra-hazardous if it 1) "necessarily involves a risk of serious harm to the person or chattels of others that cannot be eliminated by the exercise of the utmost care" and 2) "is not a matter of common usage."  Mangrum v. Pigue, 198 S.W.3d 496, 499-500 (2004) (citing Zero Wholesale Gas Co. v. Stroud, 571 S.W.2d 74 (1978)); see Carr v. Nance, 370 S.W.3d 826, 838 (2010) (affirming where jury instructions stated that "a condition is ultra-hazardous if it (1) cannot be performed without a risk of serious harm to the person or another, regardless of any precautions taken; and (2) does not normally occur in that community").

To determine whether an activity is ultra-hazardous, we must define the specific activity at issue.  The key to this task is defining the activity at the right level of generality.  On the one hand, describing an activity at a high level of generality – such as describing the activity in this case as merely "camping" – would tend to make the activity a "matter of common usage" but would not take into account relevant distinguishing characteristics.  On the other hand, describing an activity at a minute level of generality – such as "camping on June 11, 2010, at a particular time and

---

[3]As such, we need not reach the question whether the collected fees were used merely to "reduce or offset costs and eliminate losses from recreational use."  See Ark. Code Ann. § 18-11-302(2)(B) (2016).

-11-

location in Ouchita National Forest" – would make any activity "uncommon" simply because it is not precisely the same as its close relatives. Arkansas law indicates that the appropriate level of generality takes into account some particularizing factors, such as distinct and appreciable risks that might arise from engaging in an activity in a specific area. Cf. Carr, 370 S.W.3d at 839 (holding, in a case involving cables strung across trails frequented by four-wheelers, that "[i]t was not the hanging of a cable per se that constituted the ultra-hazardous activity, but the hanging of an unmarked cable at a dangerous height in an area in which the landowner knows there are people traveling on four-wheelers"). We conclude that the activity at issue in this case is "camping in a 100-year floodplain." This description appropriately pegs the definition to the knowledge that plaintiffs suggest the United States had or should have had regarding the nature of the danger posed by a 100-year floodplain, without including non-salient attributes of the tragedy. Cf. id. at 839 (including in the definition of the activity that the cable was hung in an area in "which the landowner kn[ew] there [we]re people traveling on four-wheelers").

So defined, the activity is a common recreational activity. The record indicates that camping within a 100-year floodplain is not an uncommon recreational activity in Arkansas.[4] Camping near a water source poses some risks, but campers, fishermen, and other outdoorsmen frequently visit rivers and streams to access the unique recreational activity opportunities they provide, even when doing so places them within distance of the 100-year floodplain. Because this activity is a "matter of common usage," ARUS's immunity would extend to a private landowner facing this

---

[4]We disagree with plaintiffs' contention that this argument was improperly raised in a reply brief in the district court. Cf. United States v. Castellanos, 608 F.3d 1010, 1017 (8th Cir. 2010) ("Not every new argument, or shift in approach, constitutes the raising of a new issue.").

claim.[5] And because a private landowner would be immune under the ARUS, there is no jurisdiction under the FTCA for plaintiffs' claims against the United States.[6]

## III. Conclusion

The flooding of the Little Missouri River was a devastating tragedy. We must resolve the claims arising from that tragedy by determining the extent of federal immunity under the Federal Tort Claims Act and the Arkansas Recreational Use Statute. Because we conclude that under Arkansas law a private landowner would be immune from plaintiffs' claims, we affirm the district court's dismissal for lack of subject matter jurisdiction.

───────────────────────────

───────────────────

[5]Plaintiffs argue against this conclusion by pressing other, more particularized definitions: either "camping in an RV in a flash flood zone, with no warnings posted, during a flash flood watch (and later warning)," or "locating the campsites in a floodplain, in a narrow valley between steep mountains, without posting any signs or providing any warnings even during a flash flood warning." As explained above, we believe these definitions import features of the specific event in question, rather than the general nature of the activity. Even if we were to accept plaintiffs' definition, however, ARUS would still grant immunity, because the plaintiffs would be unable to show actual knowledge of the particularized risk inherent to their more specific definitions. See Roeder, 432 S.W.3d at 632 n.5 (explaining that the "activity must be actually known to the owner to be dangerous"). Plaintiffs' claims are based on a "500 year" flood event that went far beyond the scope of the flood risk of which plaintiffs allege the United States either was or should have been aware. The limited evidence of knowledge of minor flooding events within a 100-year floodplain is insufficient to show actual knowledge of the danger to human life posed by a more serious flood event.

[6]We therefore need not discuss other issues related to this exception, such as whether the United States acted maliciously.

-13-