Cite as 2020 Ark. App. 500

# ARKANSAS COURT OF APPEALS

DIVISION IV

No. CV-18-1067

THOMASON INVESTMENTS, LLC;
AND TODD THOMASON
    APPELLANTS/CROSS-APPELLEES

V.

JOHNNY HUDDLESTON; BRENDA
HUDDLESTON; TAB
CONSTRUCTION OF HARRISON,
LLC; JOHNNY HUDDLESTON D/B/A
TAB CONSTRUCTION AND TAB
CONSTRUCTION, INC.; AND TAB
INVESTMENT, LLC
    APPELLEES/CROSS-APPELLANTS

Opinion Delivered: October 28, 2020

APPEAL FROM THE BOONE
COUNTY CIRCUIT COURT
[NO. 05CV-2015-15-4]

HONORABLE ELLEN BRANTLEY,
JUDGE

AFFIRMED IN PART; REVERSED
AND REMANDED IN PART;
AFFIRMED ON CROSS-APPEAL

## MIKE MURPHY, Judge

In 2015, the appellees Johnny Huddleston and Brenda Huddleston filed a complaint to quiet title on real property that they owned in Boone County, alleging that the appellants, Todd Thomason and Thomason Investments, refused to release a lien after they satisfied their obligation on an $80,000 mortgage. Thomason countered with several claims for damages and equitable relief against Johnny and Brenda as well as their businesses, Tab Construction and Tab Investments, alleging breach of contract, negligence, breaches of the fiduciary duty, unjust enrichment, conversion, and fraud and deceit.[1]

---

[1]For clarity, we refer to appellants Todd Thomason and Thomason Investments simply as "Thomason." We refer to the Huddlestons, Tab Construction, and Tab Investments collectively as "the Huddlestons." When it is necessary to separately discuss Johnny Huddleston and Brenda Huddleston, we use their given names.

A jury rejected most of Thomason's claims for damages in a series of interrogatories, and the circuit court, guided by the jury's verdicts, also denied equitable relief. Thomason now directly appeals those judgments, arguing that the circuit court erred by denying him equitable relief, by submitting an erroneous instruction to the jury, and by denying his motion for a judgment notwithstanding the verdict. The Huddlestons cross-appeal, asserting that the circuit court erred when it denied their request for attorney's fees pursuant to Arkansas Code Annotated section 16-22-308.

For the reasons that follow, we reverse and remand the judgment denying equitable relief. In the cross-appeal, we affirm the circuit court's order denying the Huddlestons' request for attorney's fees.

I. *Factual Background*

Thomason owns Thomason Investments, LLC, whose business is to "buy notes and mortgages at a discount." Johnny and Brenda own Tab Construction, which is in the business of building, remodeling, and repairing homes. Johnny and Brenda also provide home financing through their other company, Tab Investments.

Thomason and Johnny met in 1990 when Johnny offered to sell a mortgage on a property in Mississippi to Thomason Investments. The two men thereafter became close friends and started doing a lot of business together. As indicated above, they entered into an arrangement in which Thomason Investments would provide financing for homes that Tab Construction built and sold. As Thomason described it at trial,

> [T]he agreement . . . was [that] Johnny would borrow money from Thomason Investments. I wrote a check to Tab Construction. Johnny would sell the . . . houses to a third party. Then Johnny would sell me the mortgage. In the beginning the

2

buyer would sign a mortgage to Johnny then he would assign it to me. Later he would just assign the mortgage directly to me and [Johnny] was out of the loop.

The financing that Thomason Investments provided paid for the land, the building materials, and the labor on the houses that Tab Construction built.

In addition to building the houses, the Huddlestons collected payments on the mortgages that Thomason Investments held on these and other properties. Brenda issued receipts and recorded the mortgage payments for each property in a spreadsheet program that Thomason provided. Johnny thereafter delivered the payments—in both cash and checks—directly to Thomason.

Thomason testified that his finance arrangement with Johnny turned into "revolving credit" in 2003, when he claims he provided $150,000 for the construction of Johnny's home, and their business arrangement began to focus on building spec houses. At that time, Thomason began recording all of the checks representing loans to Johnny, the balance of Johnny's debt, and the applied credits in a single spreadsheet file. That spreadsheet, which was introduced as defendant's exhibit 105 at trial, showed a beginning balance of $149,790 on October 23, 2003, and an ending balance of $795,739 on March 10, 2007. It also demonstrated that Thomason Investments wrote checks through the years to fund multiple construction projects (often several at a time in a single check) and to pay for personal items that the Huddlestons acquired, including a truck, a boat, and a trailer.

According to Thomason, a novation occurred in March 2007 that divided the Huddlestons' $795,739 balance into three separate loans to Johnny and Brenda, Tab Construction, and Tab Investments (collectively "the Huddleston loans"). He maintained that the Huddlestons executed three promissory notes in which they personally agreed to

repay Thomason Investments $350,000; Tab Construction agreed to repay $200,000; and Tab Investments agreed to repay $245,731. Thomason further testified that after the novation, he began recording checks, payments, and other credits on separate spreadsheets for each loan. Those spreadsheets were introduced at trial as defendant's exhibits 107, 108, and 109.

At some point in 2009, when Thomason was in the middle of a contentious divorce, he delivered the Huddleston loan spreadsheets to Brenda, who, in addition to recording payments on Thomason's mortgages to third parties, began entering the Huddlestons' payments and credits on each of the three Huddleston loans.

The procedure for collecting mortgage payments from third parties also changed in 2009. Johnny and Brenda started to deliver only the cash payments to Thomason and, at Thomason's direction, deposited the check payments that they collected into Tab Construction's bank account.

At around the same time, Thomason began to show signs that he was suffering from a delusional disorder. He testified that he began to feel "sick" in 2009 and "thought people were after [him]." He feared that he would be taken to jail because he was "having the [police] called on [him] on a regular basis." Accordingly, Thomason also executed a power of attorney on August 2, 2010, that appointed Johnny as his attorney-in-fact.

Thomason's mental condition continued to deteriorate in the years that followed, leading to his arrest on March 23, 2012, and his incarceration in the Boone County Jail. At that time, and at Thomason's request, Johnny collected Thomason's business records and

4

extensive gun collection from Thomason's home and took them to his own house for safekeeping.

Shortly after Thomason was arrested, he started to hear "conflicting stories about the handling of [his] affairs" and "began losing confidence with [Johnny]." In particular, Thomason discovered that while he was in jail, Johnny used his power of attorney to transfer one of Thomason's properties to John Seals—another of Thomason's business associates. Thomason also learned that Johnny released an unpaid mortgage that Thomason Investments held on one of Mr. Seals's other properties. Consequently, Thomason revoked Johnny's power of attorney in April 2012, and on August 3, 2012, shortly after his release from jail, he requested that Johnny provide "a full, complete, and accurate accounting" of the status of several loans on Thomason properties, including the Huddleston loans.

Brenda Huddleston compiled the accounting that Johnny produced several weeks later. The three spreadsheets for the Huddleston loans were among the documents that the Huddlestons produced. Exhibit 107, which tracked the debits and credits on the loan to Tab Construction, indicated a starting balance of $200,000 and indicated that the Huddlestons were entitled to a credit of $14,069. Exhibit 108, reflecting the loan to Tab Investments, showed a starting balance of $257,839 and reflected that Thomason owed a credit of $220,249. The spreadsheet for the Huddlestons' personal loan, which was introduced as exhibit 109 at trial, showed a starting balance of $348,941 and an ending balance $263,599.

Thomason's mental illness continued into June 2014 when his bond was revoked, and he was returned to jail. His illness led to a judgment of acquittal by reason of mental

disease or defect, and he was committed to the Arkansas State Hospital in Little Rock until he was conditionally released in April 2015.

## II. *Procedural History*

On January 22, 2015, while Thomason was still in the Arkansas State Hospital, the Huddlestons filed a complaint to quiet title on their home and property. They alleged that on March 24, 2003, they mortgaged their property to Thomason Investments to secure a loan for $80,000. The Huddlestons further alleged that they had paid the loan in full and "notwithstanding full payment, Thomason fails and refuses and neglects to release the lien."

Thomason denied those allegations in an answer filed on February 24, 2015, and months later, filed several counterclaims. He sought an order of foreclosure on the Huddlestons' property, alleging that the home loan had not been paid in full as they claimed. Thomason also alleged that Johnny breached his fiduciary duty in several respects, including when he transferred property belonging to Thomason Investments to John Seals. He further claimed that Johnny fraudulently concealed information in the accounting that Thomason requested after his release from jail in 2012, and Johnny breached his fiduciary duty by "failing to collect mortgage payments and deposit them in a Thomason or Thomason Investments' account." Finally, Thomason alleged that Johnny was liable for negligence because several guns from Thomason's collection disappeared while they were in Johnny's care.

Thomason followed those allegations with a motion for accounting on March 20, 2017. He alleged that Johnny and Brenda improperly used their positions as "agents of Thomason's businesses" to "take over control of Thomason's finances, money and

6

property"; therefore, they "should be ordered to account for any and all financial transactions taken in Thomason's name," including "payments received and the disposition of payments" and "transactions related to real property and [any] credits given to various persons or entities indebted to Thomason" including the Huddlestons. Thomason further asserted that "with regard to any irregularities that are discovered, the Huddlestons should be ordered to pay back any and all monies that were misappropriated, missing, or misspent."

The circuit court granted the motion in an order entered August 8, 2017, finding that a fiduciary relationship existed among Thomason, Johnny, and Brenda, and "as [fiduciaries], the burden is on Johnny and Brenda Huddleston to prove that accounts have been properly handled." In particular, the circuit court ordered the Huddlestons to

> account for any and all actions taken in Thomason's name or in the name of Thomason Investments, LLC, including but not limited to: checks written, purchases made, cash transfers or withdrawals, payments received and the disposition of such payments, gifts and loans, bills paid, account charges, expenditures, transactions related to real property, credits given to persons or entities indebted to Thomason (including, but not limited to, Johnny and Brenda Huddleston, Tab Construction, LLC, and Tab Investment, LLC).

The Huddlestons produced two accountings. The first, called the "Later Years Accounting," accounted for the period from September 2009 to July 2012 and indicated that Tab Investments and Tab Construction were due a credit of $284,461 for their payment of taxes and other expenses related to Thomason's properties. The second, called the "Early Years Accounting," claimed that Johnny and Brenda delivered $1,006,404 in cash, checks, and money orders to Thomason from January 2002 to October 2009.

Thomason filed a response to the accountings, alleging that they were deficient in several respects. Among other things, Thomason contended that both accountings failed to

7

"attach or identify all supporting documentation," and "adequately account for the $795,000 loan from Thomason to the Huddlestons." Additionally, the Later Years Accounting, he said, failed to show delivery of "hundreds of thousands of dollars of cash, checks, and money orders collected by the Huddlestons," and "includes charges to Thomason for which the Huddlestons already received payment."

In addition, Thomason filed a third-party complaint and second amended counterclaim that asserted several more causes of action, including breach of contract, fraud, unjust enrichment, conversion, and civil action by a crime victim under Arkansas Code Annotated section 16-118-107.[2] Thomason sought compensatory and punitive damages as well as additional equitable relief in the form of a judgment for the balance due on the Huddlestons' court-ordered accounting. He also asserted that he was entitled to a constructive trust or an equitable lien on several Tab properties that were acquired with Thomason funds. The Huddlestons answered all the counterclaims, denying the material allegations and pleading affirmative defenses.

The eight-day trial was held in February 2018. Thomason testified about the novation that occurred in 2007, offering unsigned versions of the three promissory notes and the balances, payments, and credits reflected in exhibits 105, 107, 108, and 109 as evidence of his agreements with the Huddlestons and the Tab companies. He also offered the testimony of Liles Henry, a certified public accountant, who gave his expert opinion

---

[2]Tabitha Nolen, the Huddleston's daughter, was the named third party. Thomason and Thomason Investments eventually nonsuited their claims against her as well as an additional claim of civil conspiracy that alleged that Tabitha, Johnny, and Brenda acted in concert to divert Thomason funds into accounts held by Tab Construction and Tab Investments.

that the checks, receipts, spreadsheets, and other documents in the case established that the Huddlestons owed Thomason nearly $1.9 million in principal and interest. The Huddlestons, on the other hand, denied that they owed any money, and they insisted that they accounted for all of the cash and checks that they collected on the mortgages held by Thomason Investments.

For his part, Johnny testified that he and his wife "owe Todd Thomason nothing." He acknowledged that "at first [he] borrowed money to build a house then sell it and pay Thomason back," but the arrangement changed to a kind of partnership "in 2000 or 2001," when they began building spec houses. According to Johnny, he owned several of the lots where he built the spec houses, and Thomason financed the construction in exchange for obtaining the promissory notes once the properties were sold. He testified that he and Thomason sold every house that they built, and "the money [Johnny] took for the [spec] houses from Mr. Thomason was not supposed to look like a loan." Johnny claimed, rather, that he "didn't know that [Thomason] was doing it that way." Johnny also testified that several of the checks that Thomason charged against him as "loans" during that time were actually applied to repairs for Thomason's personal home or other Thomason-owned properties or were "pass through" transactions in which the money from checks written to Huddleston or one of the Tab entities was actually intended—and ultimately paid—as loans to third parties.

Johnny also testified that while he and Brenda borrowed money from Thomason to build their home in 2003, they only "signed a mortgage for $80,000" and never signed a promissory note for $150,000 as Thomason claimed. Johnny and Brenda "paid off the

9

[$80,000 mortgage] with interest" and "never borrowed any more money" for the construction of their house. Johnny claimed, rather, that the payments they made to Thomason after the satisfaction of their mortgage was to purchase Thomason properties—one of them the Sutton Building in Harrison—that were valued at $150,000. Johnny testified that he was "just trying to pay $150,000 to get the properties," but he "never got anything" and "eventually quit paying." Moreover, while Johnny acknowledged that he had been aware of the $795,739 balance in exhibit 105 and that Thomason "[broke] up one loan into three different loans to protect his assets," Johnny denied having signed three promissory notes to pay the debt as Thomason alleged.

Johnny further testified that he and Brenda also "started to collect money for [Thomason] starting in 2002 or 2003," and beginning in 2007, Brenda began to record third-party mortgage payments in the spreadsheet program that Thomason provided. In 2009, Thomason told Johnny to deposit the collected checks in the Tab Construction account "because he was trying to hide money from his ex-wife." Johnny testified that he used those funds to "pay all of the bills [and] take care of the houses" but continued to deliver the cash payments directly to Thomason.

Brenda testified that in 2007, "Thomason came and put the [spreadsheet] program on [her] computer," whereupon she started making a record of the loan payments that she collected on Thomason properties. She further testified that Thomason "added accounts for Huddleston, Tab Construction, and Tab Investments" to the spreadsheet program in 2009, but she maintained that she and her husband did not owe Thomason any money.

10

Brenda testified, rather, that she and Johnny "paid off the debt on the house on April 10, 2007," and paid the remainder of the debt for other items, including pickup trucks for their construction business, in April 2012. She further claimed, as Johnny did, that they nonetheless continued to make additional payments in order to purchase the Sutton Building and other property from Thomason. Brenda also said she gave Thomason a "full accounting" when he requested it in 2012. She claimed credits for Tab Construction and Tab Investments (in exhibit 107 and 108, respectively) because, she said, they "did [not] owe on those properties (that Thomason claimed he had financed)," and "[Thomason] said that he gave us credit . . . but was actually charging us again."

Brenda further testified that she prepared the court-ordered accountings in 2017, stating that she based them on her receipt book, the spreadsheets that she maintained on her computer, and "thousands" of other papers. She also conceded, however, that her accounting—apparently as a result of the volume of records that she had to review—was not "perfect."

Indeed, Brenda's cross-examination cast doubt on the accuracy of the accountings that she provided. The credits that she claimed in the 2012 accounting for Tab Construction (exhibit 107) and for Tab Investments (exhibit 108) were made on a single day—August 22, 2012—and based on payments that third parties—not the Tab companies—made to Thomason on their own respective mortgages. Brenda's testimony and other evidence also demonstrated that the spreadsheet that she produced for the house loan (exhibit 109), which showed that the Huddlestons still owed a balance of $263,599 in 2012, was changed in

11

2016—after the litigation began—to show "extra house payments" and a claimed credit of $178,400.[3]

Brenda also admitted that the court-ordered accounting was inaccurate in several respects. The Later Years Accounting, which covered the period from September 2009 to July 2012, erroneously claimed that the Huddlestons delivered cash to Thomason while he was in the Boone County Jail. It also failed to account for thousands of dollars that the Huddlestons admittedly collected on Thomason's behalf from August 2012 to December 2012.

Brenda also admitted that she could not produce receipts for all of the $305,931 in cash that the Later Years Accounting claimed had been delivered to Thomason between September 2009 and July 2012. She further conceded that she and her husband did not actually deliver all of that amount to Thomason. Mortgage-payment receipts and bank records demonstrated that the Huddlestons actually deposited thousands of dollars of that money into the Tab Construction account.

Brenda claimed that much of the cash that they deposited into the Tab Construction account went to pay for expenses related to a Pizza Pro business that Thomason allegedly owned. The accounting fails to give any credit to Thomason, however, on the Huddlestons' claim they should be reimbursed $50,000 for "Pizza Pro expenses."

Finally, Brenda also testified that "apparently the accounting is wrong" with regard to the $41,798 in checks that the accounting indicates the Huddlestons delivered to

---

[3]Apparently, these "extra payments" were those that the Huddlestons claim they continued to make in order to purchase the Sutton Building and other properties from Thomason.

12

Thomason between September 2009 and December 2009. Bank records demonstrated, in fact, that several checks had been deposited into the Tab Construction account.

At the conclusion of the testimony, Thomason's legal claims were submitted to the jury in a series of interrogatories. The interrogatories that are pertinent to this appeal, as well as the jury's answers to them, were as follows:

> 1. Do you find for Thomason or Thomason Investments, LLC, against Johnny Huddleston, Brenda Huddleston, Tab Investments, LLC or Tab Construction of Harrison, LLC on any of their claims? Yes.
>
> 2. Do you find for Thomason Investments, LLC against Johnny Huddleston, Brenda Huddleston, Tab Investments, LLC, or Tab Construction of Harrison, LLC, in regard to the three open accounts/claimed promissory notes? (The causes of action associated with this Interrogatory were Breach of Contract and Unjust Enrichment) No.
>
> 3. Do you find that Brenda Huddleston and Johnny Huddleston are liable to Thomason Investments, LLC, for funds not accounted for? (The causes of action associated with this Interrogatory were Breach of Fiduciary Duty, Unjust Enrichment, Conversion, Negligence, Fraud and Deceit and Civil Action by a Crime Victim.) No.
>
> 4. Do you find Johnny Huddleston is liable to Todd Thomason for the failure to return all of Todd Thomason's guns? Yes.
>
> 5. Do you find that Thomason Investments, LLC has proven that Johnny Huddleston breached his fiduciary duty by transferring property of Thomason Investments, LLC and releasing a Mortgage to John Seals? (The cause of action associated with this Interrogatory was Breach of Fiduciary Duty) Yes.

The jury awarded compensatory damages in the amount of $61,240 and declined to award any punitive damages.

Thomason subsequently filed a motion for judgment notwithstanding the verdict and alternative motion for a new trial. He challenged the jury's verdict on interrogatory No. 2 concerning his claims for breach of contract and unjust enrichment as well as the verdict on

13

interrogatory No. 3 concerning the several legal claims related to the Huddleston's failure to provide an accurate accounting.

Thomason's motion also argued that he was entitled to a judgment on the court-ordered accounting, which "[t]he evidence at trial showed . . . was false and omitted material information." He pointed to Brenda's admission, described above, that the Huddlestons did not deliver all of the cash and checks to Thomason between 2009 and 2012 as they claimed in the accounting. Thomason also asserted that the Huddlestons deposited several thousand dollars into the Tab Construction account, and they could not explain what happened to the cash that they collected while Thomason was in jail. The Huddlestons also failed, he said, to account for the funds that they admittedly collected for Thomason after July 2012 and several of the accounting's charges to Thomason were for the Huddlestons' own living expenses or the result of "double dipping." Thomason argued, therefore, that he should be awarded a judgment of $625,180 "of collected and unaccounted for funds[.]"

The circuit court expressed its own concerns about the jury's verdict in a hearing on posttrial motions on June 5, 2018. Regarding Thomason's motion for judgment notwithstanding the verdict, the circuit court noted that the "whole verdict is . . . a little bit difficult to understand," and it was "troubled" by Brenda's testimony that she "zeroed out a lot of the accounts that showed . . . the Huddlestons owing Mr. Thomason a bunch of money." The court did not find Brenda's explanations for those adjustments "real convincing," and regarding the accounting, the court explained that it was troubled by evidence showing that "the Huddlestons receiv[ed] check and cash payments [intended] for Mr. Thomason" that were "traced to their bank account." Indeed, the court observed that

14

the verdicts were inconsistent with Brenda's testimony, and there were "some severe issues with the accounting for certain sums of money after the time Mr. Thomason went to jail." Nonetheless, the court denied Thomason's motion for judgment notwithstanding the verdict, ruling that "even though it's not the verdict [it] would have rendered," the court was "just [going to] go with it." In addition, based on the jury's verdict, the circuit court denied Thomason's request for restitution on the court-ordered accounting.

The circuit court also heard the Huddlestons' request for attorney's fees, which they claimed under Arkansas Code Annotated section 16-22-308 (Repl. 1999). They asserted that they were entitled to fees under the statute because they were the prevailing party, and the case, which had both contract and tort claims, sounded primarily in contract. The circuit court denied the Huddlestons' request, ruling that the Huddlestons were not entitled to fees under section 16-22-308 because the case "was clearly an action predominantly sounding in tort."

The circuit court entered a judgment on the jury's verdict as well as an order denying relief on Thomason's equitable claims and the posttrial motions on July 2, 2018. Thomason now appeals the judgment and order and the Huddlestons cross-appeal, arguing that the circuit court erred by denying their motion for attorney's fees under Arkansas Code Annotated section 16-22-308.

III. *Direct Appeal*

A. Equitable Claims

Thomason first argues that the circuit court abused its discretion when it denied his claims for equitable relief. The abuse occurred, he says, when the circuit court failed to

15

make its own independent findings and allowed the jury's verdict to direct its ruling on the equitable claims. He asserts that the circuit court's abuse of discretion is just like the complete failures to exercise discretion that we have reversed in other contexts, including when a circuit court mechanically followed a "rule of thumb" to impose a sanction for a discovery violation in *Young v. Kajkenova*, 2010 Ark. App. 783, at 4–5, and when a circuit court followed the perceived wishes of the jury when it chose to impose consecutive sentences in *Wing v. State*, 14 Ark. App. 190, 191–93, 686 S.W.2d 452, 454 (1985). Thomason further contends that he would have prevailed on his claim for relief on the accounting, as well as his claim for a constructive trust or an equitable lien, if the circuit court had not merely adopted the jury's verdicts on the legal claims. He says that Brenda's own testimony establishes that the accountings were inaccurate, and therefore, he was entitled to restitution of the funds unaccounted for. He also argues that "the same evidence that debunked the accountings" proves that he was entitled to a constructive trust or an equitable lien.

### 1. *The standard of review*

As an initial matter, we decline Thomason's invitation to review the circuit court's denial of equitable relief for an abuse of discretion. "Arkansas appellate courts have traditionally reviewed matters that sounded in equity de novo on the record[.]" *Cason v. Lambert*, 2015 Ark. App. 41, at 4, 454 S.W.3d 250, 253. A finding of fact by a circuit court in an equity case will not be reversed, moreover, unless it was clearly erroneous. *Griffith v. Griffith*, 2018 Ark. App. 122, at 7, 545 S.W.3d 212, 216.

Beyond his assertion that the circuit court was generally "vested with discretion," Thomason does not make any effort to explain why we should abandon these standards in

16

favor of an abuse-of-discretion standard that he urges on appeal. Indeed, while Thomason cites analogous authority to show *how* the circuit court allegedly abused its discretion, he does not make any convincing argument in support of its predicate—that the abuse-of-discretion standard of review even applies in these circumstances. Because we will not consider points that are not supported by convincing argument, *Farm Credit Midsouth, PCA v. Bollinger*, 2018 Ark. App. 224, at 11–12, 548 S.W.3d 164, 173, we decline to review the circuit court's denial of equitable relief according to the abuse-of-discretion standard.

## 2. *The accounting*

With that said, we hold that the circuit court's order denying equitable relief on the accounting warrants reversal under our existing standards of review. "An accounting is an equitable remedy designed to provide a means for compelling one, who because of a confidential or trust relationship has been entrusted with property of another, to render an account of his actions and for the recovery of any balance found to be due." *A&P's Hole-In-One, Inc. v. Moskop*, 38 Ark. App. 234, 239, 832 S.W.2d 860, 863 (1992) (internal quotations omitted). The burden of proving that the accounts have been properly handled is placed on the fiduciary. *Id.* at 240, 832 S.W.2d at 863. That is because when the duty of an agent requires it, he or she "must keep true, regular, and accurate accounts of all of his [or her] transactions, both receipts and disbursements, and should render a full and complete statement, supported by proper vouchers." *Red Bud Realty Co. v. South*, 96 Ark. 281, 299, 131 S.W. 340, 348 (1910) (internal quotations omitted).

The function of a court in an accounting, moreover, "is rather that of an auditor clothed with judicial power, or that of a master stating an account." *Estates of McKnight v.*

17

*Bank of Am., N.A.*, 372 Ark. 376, 380, 277 S.W.3d 173, 177 (2008) (internal quotations omitted). This is not usually "such work as juries can perform"; therefore, "judges must take the responsibility of determining the facts as well as the law." *Crow v. Reed*, 38 Ark. 482, 485 (1882). If the fiduciary "does not keep clear, distinct, and accurate accounts, with proper vouchers," the court settling the accounts must take "all presumptions" against him and resolve all doubts adversely to him. *Moskop*, 38 Ark. App. at 240, 832 S.W.2d at 864 (internal quotations omitted).

Despite all the discrepancies that Brenda acknowledged during her testimony—not to mention the concern that the circuit court expressed about them during the June 5 posttrial hearing—there is no indication that the court considered the presumption set forth in *Moskop* before denying relief. Indeed, the circuit court expressly based its ruling on the verdicts from the jury, which as we discuss, *infra*, was not instructed to apply the presumption. Accordingly, we reverse the judgment denying equitable relief on the accounting and remand the case to the circuit court for proceedings consistent with this opinion.

### 3. *Constructive trust or equitable lien*

Thomason next argues that the circuit court erred when it denied his request for a constructive trust or an equitable lien on a list of nine properties that are titled to the Tab Companies or third-party buyers. He contends that he is entitled to those remedies because those properties were "developed with Thomason funds" and because the Huddlestons pocketed the mortgage payments that the third-party purchasers of some of those properties owed to Thomason. We disagree.

18

An equitable lien is "a right to have a demand satisfied from a particular fund or specific property." *C.A.R. Transp. Brokerage Co., Inc. v. Seay*, 369 Ark. 354, 361, 255 S.W.3d 445, 451 (2007). It "awards a nonpossessory interest in property to a party who has been prevented by fraud, accident, or mistake from securing that to which he was equitably entitled." *Id.* In addition, an equitable lien may arise "by implication from the conduct and dealings of the parties." *Id.* (internal quotations omitted). It will not be implied, however, where the facts and circumstances present no grounds for equitable relief, and there is an adequate remedy at law. *Id.* at 362, 255 S.W.3d at 451.

A constructive trust, on the other hand, "is an implied trust that arises by operation of law when equity demands." *Tripp v. Miller*, 82 Ark. App. 236, 244, 105 S.W.3d 804, 810 (2003). "It is imposed where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it." *Id.*

"To impose a constructive trust, there must be full, clear, and convincing evidence leaving no doubt with respect to the necessary facts, and the burden is especially great when a title to real estate is sought to be overturned by parol evidence." *Betts v. Betts*, 326 Ark. 544, 548, 932 S.W.2d 336, 338 (1996) (internal quotations omitted). "The test on review is not whether the court is convinced that there is clear and convincing evidence to support the [circuit court's] finding, but whether it can say the [circuit court's] finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous, and [this court] defer[s] to the superior position of the [circuit court] to evaluate the evidence." *Id.*

We cannot say that the circuit court clearly erred by denying Thomason's request. While there was ample testimony that Thomason financed Tab Construction's purchases of property and construction of homes, the trial evidence does not coherently draw the line from Thomason's money to the particular properties for which he now claims a constructive trust or an equitable lien. Indeed, Thomason often paid for several properties with a single check, and the witnesses interchangeably referred to the same properties by their street addresses, their lot numbers, or the last names of the purchasers (or in some cases, even the purchaser's successor in interest). The testimony also demonstrated that several of the checks that Thomason identified as loans to the Huddlestons were actually "pass-through" transactions intended for third parties. Thomason's brief on appeal, moreover, makes no effort to discuss the evidence connecting his money with the properties on the list. Therefore, we cannot say that the circuit court's denial of Thomason's request for a constructive trust or an equitable lien was clearly erroneous.

## B. Jury Instruction

At the conclusion of all the evidence, the jury was told that it would settle issues of fact in a series of interrogatories that included interrogatory No. 3, which, as noted above, asked the jury whether it found that the Huddlestons were liable to Thomason for "funds not accounted for." The interrogatory pertained to Thomason's claims of breach of fiduciary duty, unjust enrichment, conversion, negligence, fraud, and civil action by a crime victim. Thomason proffered the following instruction, based on *Moskop*, for the jury to consider as it answered interrogatory No. 3:

> The burden of proving that the accounts had been properly handled is placed on the fiduciary. The degree of difficulty in preparing a fiduciary account does not

20

foreclose the need of it. If a fiduciary does not have the proper records, then every presumption must be taken adversely to the fiduciary.

The circuit court submitted the instruction to the jury without the sentence directing the jury to take "every presumption" adversely to the Huddlestons. Thomason now argues that was error. We disagree.

"Under Arkansas law, a party is entitled to a jury instruction when it is a correct statement of the law and there is some basis to support giving the instruction." *Sealing Devices, Inc. v. McKinney*, 2009 Ark. App. 412, at 8, 321 S.W.3d 270, 279. This court will not reverse a circuit court's refusal to give a proffered instruction, moreover, unless there was an abuse of discretion. *Id*. Because Thomason cannot demonstrate reversible error, we affirm.

This court will reverse a ruling of a circuit court only if it committed prejudicial error, *Smith v. Smith*, 2015 Ark. App. 539, at 3, and Thomason cannot be heard to complain about the missing presumption because he received more than he was entitled when the circuit court instructed the jury according to any part of the law of accountings. We reiterate that "[a]n accounting is an equitable remedy"; therefore, "the question of an accounting may not be submitted to a jury as if it were a suit for the recovery of money." *McKnight*, 372 Ark. at 380, 277 S.W.3d at 177. Additionally, the given instruction, which placed the burden of proof on the Huddlestons, was at odds with other instructions that correctly told the jury that Thomason had the burden of proving his legal claims. Therefore, we conclude that Thomason cannot demonstrate prejudice from the circuit court's refusal to instruct the jury according to the presumption.

## C. Motion for Judgment Notwithstanding the Verdict

In his final point on appeal, Thomason asserts that the circuit court erred by denying his motion for a judgment notwithstanding the verdict. Specifically, he contends that the jury's verdicts cannot stand under the weight of Brenda's admissions at trial, which, he says, demonstrate that the Huddlestons still owe him money and that they pocketed mortgage payments payable to him. Thomason does not specify which of his many claims were established by Brenda's testimony as a matter of law, but assuming that he is now challenging—as he did below—the jury's verdicts on all the claims decided in interrogatory No. 2 and interrogatory No. 3, we affirm.

On review of a circuit court's denial of a motion for a judgment notwithstanding the verdict, we "will reverse only if there is no substantial evidence to support the jury's verdict, and the moving party is entitled to a judgment as a matter of law." *Carr v. Nance*, 2010 Ark. 497, at 15, 370 S.W.3d 826, 836 (internal quotations omitted). "Substantial evidence is that which goes beyond suspicion or conjecture and is sufficient to compel a conclusion on way or the other." *Id*. at 15–16, 370 S.W.3d at 836. This court does not try issues of fact; rather we "simply review the record for substantial evidence to support the jury's verdict." *Id*. at 16, 370 S.W.3d at 836. In determining whether there is substantial evidence, this court "view[s] the evidence and all reasonable inferences arising therefrom in the light most favorable to the party on whose behalf judgment was entered." *Id*. A motion for judgment notwithstanding the verdict should be denied, moreover, "when there is a conflict in the evidence, or when the evidence is such that fair-minded people might reach different conclusions." *Id*. Indeed, "the weight and value to be given to the testimony of witnesses

22

is a matter within the exclusive province of the jury." *Cadillac Cowboy, Inc. v. Jackson*, 347 Ark. 963, 971, 69 S.W.3d 383, 389 (2002).

The circuit court did not err by denying the motion for judgment notwithstanding the verdict on the breach-of-contract and unjust-enrichment claims decided in interrogatory No. 2. "In order to prove a breach-of-contract claim, one must prove the existence of an agreement, breach of the agreement, and resulting damages." *Jones v. John B. Dozier Land Tr.*, 2017 Ark. App. 23, at 6, 511 S.W.3d 869, 873. To prove the alternative theory of unjust enrichment, "a party must have received something of value, to which he or she is not entitled and which he or she must restore." *Campbell v. Asbury Auto., Inc.*, 2011 Ark. 157, at 21, 381 S.W.3d 21, 36. "There must be some operative act, intent, or situation to make the enrichment unjust and compensable." *Id.* "One who is free from fault cannot be held to be unjustly enriched merely because he or she has chosen to exercise a legal or contractual right." *Id.* "In short, an action based on unjust enrichment is maintainable where a person has received money or its equivalent under such circumstances that, in equity and good conscience, he or she ought not to retain." *Id.*

While Thomason introduced compelling testimony that the Huddlestons owed him well over $795,000, he failed to produce signed promissory notes or recorded mortgages as evidence of those debts. The Huddlestons claimed that they did not sign any promissory notes for the novation in 2007, and they denied that they still owed Thomason any money. Spreadsheets produced at trial also showed that the Huddlestons were entitled to credits in each of the three Huddleston loan accounts. While reasonable minds may weigh these exhibits and the Huddlestons' testimony differently, on review of an order denying a

23

judgment notwithstanding the verdict, this court leaves the weight and value of the evidence to the exclusive province of the jury. *Jackson*, 347 Ark. at 971, 69 S.W.3d at 389. Therefore, Thomason's challenges to the jury's verdict on his claims of breach of contract or unjust enrichment lack merit.

The circuit court likewise did not err by denying a judgment notwithstanding the verdict on the many claims that the jury decided with its answer to interrogatory No. 3. Thomason appears to assert that all those claims, including conversion, civil action by a crime victim, breach of fiduciary duty, negligence, unjust enrichment, and fraud and deceit, were established as a matter of law when Brenda admitted—contrary to the accounting— that she and Johnny failed to deliver all the mortgage payments that they collected to Thomason. We disagree.

Brenda's admissions conflict with other evidence showing that the Huddlestons delivered all the payments that they collected. Johnny and Brenda testified that they delivered all cash and check payments to Thomason until 2009 when they agreed to deposit the checks into the Tab Construction account. They also testified that they continued to deliver the cash payments to Thomason, and the court-ordered accounting that they prepared, which was also admitted at trial, supports that claim. While Brenda's admissions that they did not actually deliver all the cash they collected certainly impeaches the accounting and their earlier testimony, the resolution of that conflict is—again—exclusively in the province of the jury. Accordingly, we find no error in the circuit court's denial of Thomason's motion for judgment notwithstanding the verdict.

IV. *Cross-Appeal*

In their cross-appeal, the Huddlestons argue that the circuit court erred by denying their request for attorney's fees under Arkansas Code Annotated section 16-22-308. They assert that they were entitled to fees as the prevailing parties on Thomason's breach-of-contract claim. Thomason responds that fees were not available under the statute because the case primarily sounded in tort. For the reasons that follow, we affirm.

Attorney's fees are not allowed except when expressly provided for by statute. *Nissan N. Am., Inc. v. Harlan*, 2017 Ark. App. 203, at 12, 518 S.W.3d 89, 97. As stated, the Huddlestons claimed that they were entitled to fees pursuant to section 16-22-308, which provides as follows:

> In any civil action to recover on an open account, statement of account, account stated, promissory note, bill, negotiable instrument, or contract relating to the purchase or sale of goods, wares, or merchandise, or for labor or services, or breach of contract, unless otherwise provided by law or the contract which is the subject matter of the action, the prevailing party may be allowed a reasonable attorney's fee to be assessed by the court and collected as costs.

"This section has been held to authorize an award of attorney's fees to a party who successfully defends against a contract claim." *C & W Transp., LLC v. Whittington*, 90 Ark. App. 213, 216, 205 S.W.3d 157, 158 (2005). In cases in which both contract and tort claims are pursued, we have held that fees are proper under section 16-22-308 only when the action is based primarily in contract. *DWB, LLC v. D & T Pure Tr.*, 2018 Ark. App. 283, at 13, 550 S.W.3d 420, 430.

As indicated above, the circuit court denied attorney's fees because the case "predominantly sounded in tort." The litigation started with the Huddlestons' complaint to quiet title and Thomason's counterclaim for foreclosure based on the mortgage on the

Huddlestons' home. Thereafter, Thomason sought damages on a single claim of breach of contract or unjust enrichment based on the Huddleston loans. The remainder of his claims sounded in tort, including several alleged instances of breach of fiduciary duty, conversion, negligence, and fraud and deceit. On these facts, we agree with the circuit court's assessment that the litigation primarily sounded in tort, and we affirm the order denying the Huddleston's request for attorney's fees under section 16-22-308.

V. *Conclusion*

We reverse and remand the judgment denying equitable relief on the Huddlestons' inadequate accounting. The settling of accounts is a function that is reserved exclusively to the circuit court, and the circuit court clearly erred by relying on the jury's verdict to deny relief. We affirm the judgment on Thomason's legal claims and the order denying the Huddlestons' request for attorney's fees.

Affirmed in part; reversed and remanded in part; affirmed on cross-appeal.

VAUGHT, J., agrees.

GRUBER, C.J., concurs.

*Cullen & Co., PLLC*, by: *Tim Cullen*, for appellants/cross-appellees.

*Smith, Cohen & Horan, PLC*, by: *Matthew T. Horan*; and *Everett Law Firm*, by: *John C. Everett*, for appellees/cross-appellants.

26