# United States Court of Appeals

## For the Eighth Circuit

_____

No. 24-2665

_____

Stephen R. Allen, as Administrator of the Estate of J.R.A., a minor, deceased

*Plaintiff - Appellant*

v.

Nature Conservancy; Clayton Word; Federal Insurance Company; Great Northern Insurance Company; Chubb Custom Insurance Company; Chubb Indemnity Insurance Company; Chubb National Insurance Company; Travelers Indemnity Company; Phoenix Insurance Company; Charter Oak Fire Insurance Company; Travelers Property Casualty Company of America; Travelers Indemnity Company of Connecticut; Travelers Indemnity Company of America; Allianz Global Corporate & Specialty SE; Fireman's Fund Insurance Company

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Central

_____

Submitted: January 14, 2026
Filed: March 5, 2026

_____

Before LOKEN, GRUENDER, and GRASZ, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Stephen Allen's son died after a river current pulled him beneath a bridge and into a culvert. The Nature Conservancy, a conservation nonprofit, owned the land surrounding the bridge. Allen filed suit against The Nature Conservancy and its insurers, alleging negligence and malicious failure to warn of an ultra-hazardous condition. The defendants filed motions to dismiss for failure to state a claim, and the district court[1] granted defendants' motions. Allen appeals, and we affirm.

## I. Background

When reviewing the grant of a motion to dismiss, we accept the well-pleaded allegations in the complaint as true. *Varga v. U.S. Bank Nat'l Ass'n*, 764 F.3d 833, 838 (8th Cir. 2014). Allen's complaint alleges the following facts.

In June 2021, Allen and his family went on a trip in Arkansas. During their trip, they came upon the Lydalisk Bridge, a low-water crossing that spans the Middle Fork of the Little Red River. At the time, the Lydalisk Bridge was a paved surface resting over ten culverts. When the river's current was low, water flowed below the paved surface, through the culverts. When the river's current was high, water also flowed over the paved surface. Because the Lydalisk Bridge partially obstructed the river's flow, there was a shallow pool of water on the upstream side of the bridge where water accumulated before passing through the bridge's culverts or above the bridge's paved surface. Within the upstream pool, there were underwater currents that accelerated near the culverts' narrow entrances. When Allen and his family came upon the Lydalisk Bridge, there were no warnings posted nearby against swimming in the upstream pool.

---

[1]The Honorable James M. Moody, Jr., United States District Judge for the Eastern District of Arkansas.

Allen's seven-year-old son, J.R.A., went swimming in the upstream pool, closely accompanied by his mother. The river current abruptly pulled J.R.A. underwater and into one of the bridge's culverts. Because the culvert was narrow and partially clogged with debris, J.R.A. became stuck inside of it. Allen did everything he could to save his son. Although Allen was eventually able to pull J.R.A. out of the culvert with a rope, J.R.A. died the next day.

The Nature Conservancy owned the land surrounding the Lydalisk Bridge and the upstream pool. The Nature Conservancy also owned nearby land containing the Alberg Bridge, another low-water crossing, which had a similar design to the Lydalisk Bridge. At least two months before J.R.A.'s death, The Nature Conservancy commissioned engineering reports of the two bridges. One month before J.R.A.'s death, The Nature Conservancy received the report for the Alberg Bridge. The report warned that the Alberg Bridge's culverts presented a safety risk because the water current near their entrances was quick enough to pull a person into a culvert. The report also noted that, according to local fishermen, at least one person had already been pulled into the Alberg Bridge's culverts, and that "the risk is very real." The Nature Conservancy received the corresponding report for the Lydalisk Bridge only after J.R.A.'s death. That report also concluded that the Lydalisk Bridge's culverts presented a safety risk.

Allen filed suit against The Nature Conservancy and its insurers, alleging that The Nature Conservancy maliciously failed to warn against an ultra-hazardous condition and that both The Nature Conservancy and the insurers were liable for negligence.[2] The defendants moved to dismiss the suit for failure to state a claim. *See* Fed. R. Civ. P. 12(b)(6). The district court, having jurisdiction under 28 U.S.C. § 1332, granted the defendants' motions. In its decision, the district court relied on two Arkansas statutes.

---

[2]Allen initially also brought a negligence claim against Clayton Word, a project manager at The Nature Conservancy, but the district court dismissed this claim for lack of subject matter jurisdiction, and Allen does not appeal that dismissal.

First, the district court determined that the Arkansas Recreational Use Statute ("ARUS"), Ark. Code Ann. § 18-11-301 *et seq.*, limited The Nature Conservancy's duty of care to keep its premises safe. ARUS provides that, subject to two exceptions, "an owner of land owes no duty of care to keep the premises safe for entry or use by others for recreational purposes or to give any warning of a dangerous condition . . . to persons entering for recreational purposes." *See* § 18-11-304. The two exceptions to this rule are: (1) "[f]or malicious, but not mere negligent, failure to guard or warn against an ultra-hazardous condition . . . actually known to the owner to be dangerous," and (2) "[f]or injury suffered in any case" in which the landowner charges a fee to those who enter the land for recreational use (unless the fee is consideration for leasing the land). *See* § 18-11-307.[3] In addition, and again subject to these two exceptions, ARUS provides that:

> an owner of land who . . . invites or permits without charge any person to use his or her property for recreational purposes does not thereby . . . [c]onfer upon the person the legal status of an invitee or licensee to whom a duty of care is owed [or] . . . incur liability for injury . . . caused by any natural or artificial condition . . . on the land.

§ 18-11-305. The district court determined that Allen had not alleged facts sufficient to prove that The Nature Conservancy maliciously failed to warn of an ultra-hazardous condition. The district court therefore concluded that, under ARUS, Allen had not alleged facts sufficient to show that The Nature Conservancy had breached a duty of care.

Second, the district court determined that Arkansas's Direct-Action Statute ("DAS") precluded Allen's claims against the insurers. DAS authorizes a plaintiff to sue an organization's liability insurance provider directly—but only in limited circumstances. *See* Ark. Code Ann. § 23-79-210. Specifically, DAS authorizes a plaintiff to bring such a lawsuit "[w]hen liability insurance is carried by any

___

[3]As Allen has not alleged that The Nature Conservancy charged him and his family a fee to enter its land, this second exception is inapplicable to this case.

-4-

cooperative nonprofit corporation, association, or organization, . . . or by any other organization . . . of any kind or character and *not subject to suit for tort*" and if the plaintiff is injured "on account of the negligence or wrongful conduct of the organization." § 23-79-210(a)(1) (emphasis added). The district court determined that The Nature Conservancy was still subject to suit despite its protections under ARUS and therefore that DAS did not authorize Allen to sue the insurers directly.

Allen appeals the dismissal of his suit.

## II.  Discussion

We review *de novo* the district court's grant of defendants' motion to dismiss, accepting as true all factual allegations in the light most favorable to Allen.  *See Ahern Rentals, Inc. v. EquipmentShare.com, Inc.*, 59 F.4th 948, 953 (8th Cir. 2023). We evaluate whether Allen's complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *See id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.  We also review *de novo* issues of statutory interpretation. *Behlmann v. Century Sur. Co.*, 794 F.3d 960, 963 (8th Cir. 2015).

## A.

The district court properly dismissed Allen's claims against The Nature Conservancy.  Allen's negligence claim can proceed only if he also sufficiently pleaded his claim for malicious failure to warn of an ultra-hazardous condition.  This is because, under ARUS, The Nature Conservancy could only have breached a duty of care to keep its premises safe for Allen and his family if it maliciously failed to guard or warn against an ultra-hazardous condition that it actually knew to be dangerous.  *See* §§ 18-11-304, -307.  The district court determined that Allen had

not alleged facts sufficient to show that The Nature Conservancy acted maliciously in failing to warn or guard against the Lydalisk Bridge's conditions. We agree.[4]

"Malice is not an easy bar to clear under [ARUS]." *Hutchinson v. United States*, 71 F.4th 1115, 1119 (8th Cir. 2023). Malicious conduct requires "an intentional act of misconduct that the actor is aware is likely to result in harm." § 18-11-302(4)(A). Allen argues that this definition's use of the term "intentional" encompasses recklessness. But this is wrong; ARUS also instructs that "'[m]alicious' does not mean negligent or reckless conduct," § 18-11-302(4)(B).

At most, Allen has plausibly pleaded that The Nature Conservancy acted recklessly. Allen alleges that because The Nature Conservancy received the engineering report for the Alberg Bridge, it knew of the Lydalisk Bridge's safety risks. But this allegation does not necessarily imply that The Nature Conservancy's failure to warn or guard against the Lydalisk Bridge was intentional. To illustrate, Allen does not allege facts sufficient to show that anyone at The Nature Conservancy made an intentional decision not to post warning signs. *Cf. Moss v. United States*, No. 4:12-cv-4030, 2017 WL 1158087, at *7 (W.D. Ark. Mar. 28, 2017), *aff'd on other grounds*, 895 F.3d 1091, 1100-01 (8th Cir. 2018). Allen alleges that The Nature Conservancy acted "maliciously, intentionally, and consciously." But this is a conclusory assertion and is thus "not entitled to be assumed true." *See Iqbal*, 556 U.S. at 681. Although "intent . . . may be alleged generally," *see* Fed. R. Civ. P. 9(b), a plaintiff cannot "plead the bare elements of his cause of action, affix the label 'general allegation,' and expect his complaint to survive a motion to dismiss." *See Iqbal*, 556 U.S. at 687. Therefore, Allen has failed to plausibly plead that (1) The Nature Conservancy maliciously failed to warn of an ultra-hazardous condition and, by extension, that (2) it breached a duty of care under ARUS.

---

[4]Like the district court, we assume without deciding that the Lydalisk Bridge presented an ultra-hazardous condition.

Allen presents two alternative theories of how The Nature Conservancy can still be liable for his negligence claims even if it owed him and his family no duty of care under ARUS. First, Allen argues that The Nature Conservancy voluntarily assumed a duty of care to guard against the dangers created by the Lydalisk Bridge. Allen is correct that, under Arkansas law, "[a] party who gratuitously undertakes a duty can . . . be liable for negligently performing that duty." *Steward v. McDonald*, 958 S.W.2d 297, 299 (Ark. 1997). However, under ARUS, The Nature Conservancy "owe[d] no duty of care to keep the premises safe" for Allen and his family, "[e]xcept as specifically recognized by or provided in § 18-11-307." *See* § 18-11-304. And § 18-11-307 provides no exception for voluntarily assumed duties. The Nature Conservancy therefore did not voluntarily assume a duty of care to keep its premises safe for Allen and his family.

Second, Allen suggests that The Nature Conservancy, which owned the land surrounding the Lydalisk Bridge, might not have owned the bridge itself. If true, Allen argues, then The Nature Conservancy can be subject to extraterritorial liability. The Arkansas Supreme Court has observed that "[w]hen an owner or operator learns or should have learned of a dangerous condition existing adjacent to his property and fails to attempt to correct the condition or warn the invitees of such danger, he is guilty of negligence." *See Ollar v. Spakes*, 601 S.W.2d 868, 870-71 (Ark. 1980). But this extraterritorial liability extends only to an owner or operator's *invitees*. *See id.* Allen has not alleged facts sufficient to show that he and his family were The Nature Conservancy's invitees. Under ARUS, the mere fact that The Nature Conservancy permitted Allen and his family onto its land for recreational purposes did not thereby "[c]onfer upon [them] the legal status of an invitee . . . to whom a duty of care is owed." *See* § 18-11-305(2). Allen thus has not plausibly pleaded that The Nature Conservancy can be subject to extraterritorial liability.

Therefore, Allen has not plausibly pleaded a claim against The Nature Conservancy.

**B.**

The district court also properly dismissed Allen's claims against the insurers. ARUS provides several protections to landowners. One of those protections, discussed above in Section II(A), narrows a landowner's duty of care to keep its premises safe. *See* § 18-11-304. Another one of those protections provides landowners with immunity ("ARUS immunity") from liability against certain types of claims. *See* § 18-11-305. Allen argues that if The Nature Conservancy is entitled to ARUS immunity, he should be able to invoke DAS to bring a direct suit against its insurers because The Nature Conservancy is "not subject to suit for tort." *See* § 23-79-210(a)(1). But Allen is incorrect. As the Arkansas Supreme Court has explained, DAS "only provides for direct actions against an insurer in the event that the organization at fault is immune from *suit*." *See Smith v. Rogers Grp., Inc.*, 72 S.W.3d 450, 459-60 (Ark. 2002) (emphasis added). And as explained below, ARUS immunity does not confer immunity from suit. Thus, Allen cannot invoke DAS to bring a direct suit against The Nature Conservancy's insurers.

ARUS only confers immunity from *liability*—not from suit. The Arkansas Supreme Court has explained that immunity from liability is different than immunity from suit. *See id.* at 460. "Immunity from suit is the entitlement not to stand trial, while immunity from liability is a mere defense to a suit." *Id.* The court has also indicated that a provision that confers immunity from liability does not necessarily also confer immunity from suit. *See Baptist Health v. Sourinphoumy*, 659 S.W.3d 689 (Ark. 2023). In *Baptist Health*, the court concluded that an Arkansas executive order that conferred certain immunities to healthcare providers did not confer immunity from suit because the order "plainly state[d] that healthcare providers shall be 'immune from liability.'" *See id.* at 691. Like the executive order in *Baptist Health*, ARUS's plain language indicates that it confers immunity from liability. ARUS immunity comes from a section titled "Limitation on *liability*," which provides that landowners who invite or permit "without charge any person" to use their property "for recreational purposes do[] not thereby . . . incur *liability* for any injury to the person or property caused by any . . . condition . . . on the land."

§ 18-11-305 (emphasis added). And like the executive order in *Baptist Health*, ARUS never refers to protections from suit. *See* §§ 18-11-304, -305. The reasoning in *Baptist Health* thus applies here as well, meaning that ARUS confers immunity only from liability. "Because [The Nature Conservancy] is not immune from suit, the direct-action statute is not applicable." *See Smith*, 72 S.W.3d at 460.[5]

Allen argues that in *Low v. Ins. Co. of N. Am.*, 220 S.W.3d 670 (Ark. 2005), the Arkansas Supreme Court concluded that a non-profit organization is "not subject to suit" under DAS even if it is only immune from liability. Thus, Allen argues, when a non-profit organization is immune from liability, DAS authorizes direct suits against its insurers. But Allen's characterization of *Low* is not quite right. *Low* held that an organization entitled to *charitable immunity* is not subject to suit under DAS. *See id.* at 677 ("Over the years . . . this court has interpreted the charitable-immunity doctrine as preventing *suits* against charitable organizations and not merely allowing a defense to liability"). As the Arkansas Supreme Court has explained, "not all not-for-profit organizations will be immune under the [charitable immunity] doctrine." *See Neal v. Sparks Reg'l Med. Ctr.*, 289 S.W.3d 8, 11 (Ark. 2008).[6] On appeal, Allen never argues why The Nature Conservancy would be entitled to charitable

---

[5]Allen is correct that, because DAS authorizes direct suits against insurers of organizations "of any kind or character," *see* § 23-79-210(a)(1), the district court erred in suggesting that DAS only authorizes direct suits against insurers of particular kinds of organizations. Nonetheless, DAS only authorizes suits against insurers of organizations that are "not subject to suit for tort." *See* § 23-79-210(a)(1).

[6]Arkansas courts apply an eight-factor test to assess whether an organization is entitled to charitable immunity. Those eight factors are: "(1) whether the organization's charter limits it to charitable or eleemosynary purposes; (2) whether the organization's charter contains a 'not-for-profit' limitation; (3) whether the organization's goal is to break even; (4) whether the organization earned a profit; (5) whether any profit or surplus must be used for charitable or eleemosynary purposes; (6) whether the organization depends on contributions and donations for its existence; (7) whether the organization provides its service free of charge to those unable to pay; and (8) whether the directors and officers receive compensation." *Davis Nursing Ass'n v. Neal*, 570 S.W.3d 457, 460-61 (Ark. 2019).

immunity. To the contrary, he describes the legal test for charitable immunity as a "non-issue." Therefore, *Low* does not automatically render The Nature Conservancy not subject to suit under DAS.

Further, *Low* expressly preserved *Smith*, where the Arkansas Supreme Court announced its general rule that DAS does not authorize a direct suit against a defendant's insurer when the defendant is immune only from liability. *See Smith*, 72 S.W.3d at 459-60. The court in *Low* stated that *Smith* "properly applied the distinction between immunity from liability and immunity from suit in the context of the acquired-immunity doctrine." *See Low*, 220 S.W.3d at 680. And although Allen suggests otherwise, *Low* never provided any reason why this distinction would *only* apply "in the context of the acquired-immunity doctrine." *See id.* We are left to conclude that *Smith*'s general rule still applies except in the charitable immunity context, which is not at issue here.

Allen also argues that we should consider an organization to be not subject to suit under DAS if it is entitled to immunity from suit *or* immunity from liability. Allen argues that these types of immunity are functionally quite similar and that we should construe DAS liberally to benefit injured parties. However, the Arkansas Supreme Court drew the legal distinction between these types of immunity, *see, e.g.*, *Smith*, 72 S.W.3d at 460; *Baptist Health*, 659 S.W.3d at 691, and it is not our place to disturb that distinction here. *See Adams v. Fuqua Indus., Inc.*, 820 F.2d 271, 278 (8th Cir. 1987) ("We look to the highest court of the state as the final authority on state law.").

Even if The Nature Conservancy is entitled to ARUS immunity, ARUS does not confer immunity from suit. Thus, Allen has not plausibly pleaded that he can invoke DAS to bring a direct lawsuit against The Nature Conservancy's insurers.

-10-

### III.  Conclusion

The events in this case are tragic.  However, because Allen has not presented a claim that can overcome defendants' motions to dismiss, we affirm.

_____